STATE of Tennessee, Appellee,

v.

Robert BELL, Appellant.

Court of Criminal Appeals of Tennessee,
at Knoxville.

Aug. 26, 1991.

Permission to Appeal Denied by
Supreme Court Jan. 27, 1992.

**584**

Eugene B. Dixon and Vickie V. Valentine, Koella & Dixon, Maryville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Jeannie Kaess, Asst. Atty. Gen., Nashville, Mike Flynn, Dist. Atty. Gen. (Present), David G. Ballard, Dist. Atty. Gen. (Former), and Steven R. Hawkins, Asst. Dist. Atty. Gen., 5th Judicial Dist., Maryville, for appellee.

## OPINION

SUMMERS, Judge.

Appellant, Robert Bell, presents this appeal challenging his convictions and sentences. After a jury found appellant guilty of five counts of promoting prostitution, the trial court imposed five consecutive two-year sentences and ordered appellant to pay a fine of $3,000.00 as punishment for count five. The fine was recommended by the jury. Appellant does not contest the sufficiency of the evidence but alleges that his convictions are a result of the trial court's erroneous refusal to suppress certain incriminating evidence. He further believes that the trial court erred in entering the maximum possible sentence and denying appellant's request for probation.

## I. FACTS

As a result of various reports and subsequent investigations, the Blount County Sheriff's Department obtained a warrant to search an establishment known as Sue Lynn's Health Studio (hereinafter "Sue Lynn's"). The department had reason to believe that appellant was running an illegal prostitution operation at Sue Lynn's. Sheriff's officers also obtained a warrant to search a mobile home which was in close proximity to Sue Lynn's. Officers believed that appellant occupied the mobile home and expected to find therein certain items such as written records, tally sheets, job assignments, work schedules, cash receipts, telephone numbers, client lists, and a large sum of unreported cash.

On November 20, 1989, detectives James Widener and Ron Martin participated in the execution of the search warrants. They were accompanied by a team of other officers who were instructed to conduct a thorough search of the targeted premises. These officers drove to Sue Lynn's in an unmarked van and parked in the customers' parking lot behind the building. The establishment had wrought iron doors which ordinarily remained locked until a customer would ring the doorbell.

Prior to searching the premises, an undercover agent, Warren Headrick, rang the doorbell and was invited to enter Sue Lynn's. He paid the manager to spend thirty minutes with a lady. He selected a lady from among a group congregating in the lounge. They went to a bedroom where the woman agreed to perform a sexual act for money. She then undressed. Minutes later Sue Lynn's was raided.

In order to have a smooth entry, Detective Martin, who was not in uniform, rang the doorbell and allowed those inside to think he was a regular paying customer. When the door was opened, Detectives Martin and Widener entered and introduced themselves. At this point, the manager on duty, R.L. Matthews, was apparently informed that the detectives had a warrant to search Sue Lynn's.

As they entered the establishment and began to look around, they noticed some

women in a room identified as the lounge. They walked through a kitchen area, and from that room they noticed a bedroom. Inside this bedroom they found a mattress and box springs on the floor. Beside the bed was a table with various body lotions, a sealed condom, and a thirty-minute timer. In the kitchen Officer Widener saw a sign listing a number of rules which informed the women and managers they would be fined for certain improper behavior. Some of the rules to which the women were subjected were as follows:

1. Each lady is to be ready for work by the time her shift begins or be fined $50.00 plus $1.00 for each additional minute she is late.

    *    *    *    *    *    *

4. Ladies will have hair fixed and make-up on at all times.

    *    *    *    *    *    *

9. The ladies working the 9:00 p.m. to 9:00 a.m. [shift] will get their sleep at home....

10. When customers come in, look at him and smile. Forget the TV. Anyone not doing so will be fired.

11. Any time a session runs five minutes over what the customer paid for the customer or the lady will pay for another session.

    *    *    *    *    *    *

21. No lady is to walk in during shift and do a customer unless she is scheduled to work that shift.

In the lounge, on the manager's desk, officers observed a "tally sheet" which listed the names of various women and had a time marked by each name. They looked inside the garbage can situated in the kitchen and found three used condoms. The business license, which was also found in Sue Lynn's, listed Kurt Deals as the proprietor. All these items were seized and presented at trial.

Numerous photographs were taken of the establishment, many of them depicting erotic posters which had been placed on the walls of the bedrooms. Several unopened packages containing condoms and various feminine hygiene products were also seized. The business apparently accepted credit cards as evidenced by devices used to process Visa and MasterCard.

Behind Sue Lynn's and next to the parking lot was a garbage dumpster. A search of the dumpster revealed approximately seventy used condoms and various papers relating to the business activities at Sue Lynn's. These items were seized.

While Sue Lynn's was being searched, another team was searching the aforementioned nearby trailer. No one except the sheriff's officers were present during this search. A number of items were seized from this location.

Officer Widener proceeded to the trailer about the time the search of the trailer was concluded. On his way to the trailer he noticed appellant and Kurt Deals. Widener informed the two that the sheriff's department was conducting a search of Sue Lynn's and the trailer. Appellant stated that he had no ownership interest nor any association with Sue Lynn's. He further informed Widener that he did not live in the trailer because he had rented it to someone a few days earlier. Mr. Deals, on the other hand, admitted to have full ownership of Sue Lynn's. Appellant and Deals were arrested and searched. Among the items found on appellant's person was cash in the amount of $5,173.00.

At trial, the state based its case on the testimony of ten witnesses and several exhibits, many of which were items seized in the searches discussed above.

One of the witnesses called by the prosecution was Star Overman, a prostitute who assisted in organizing and establishing Sue Lynn's. Prior to Sue Lynn's origination, she had been working as a prostitute and living with a man named Melvin Grant. Appellant's wife worked as a prostitute with Ms. Overman. In the fall of 1986 appellant and Grant decided to open their house of prostitution and asked Ms. Overman if she would like to join them in their venture.

They decided to open the house of prostitution in Blount County because Ms. Overman's mother was acquainted with Avery

Mills who had recently been elected sheriff. According to Ms. Overman's testimony, appellant met with Sheriff Mills on two occasions to discuss the possibility of operating a house of prostitution in Blount County. After the second meeting, appellant reported to Grant and Overman that "everything was a go—that we would be able to open up and that it would cost us a Thousand Dollars a month."

Overman, Grant, appellant, and his wife assisted in organizing the business. First they found a place in which to open. Then they had to renovate and furnish the establishment. Appellant was responsible for obtaining a business license, opening bank accounts, and taking out advertisements.

The proprietors, including appellant, decided on the prices they would charge their customers. Overman's testimony in this regard was as follows:

A. [By witness Overman] We didn't want any trash in the place. Riff-raff. So, we would keep the prices kind of high, like they were in Chattanooga....

Q. [By Assistant District Attorney Hawkins] Prices like—what are you talking about?

A. A Hundred Dollars for oral sex, or intercourse, and Hundred and Fifty Dollars for a half and half.

Q. A half and half, what is that?

A. Part oral and intercourse.

     *    *    *    *    *    *

Q. Did Mr. Bell [appellant] agree on that?

A. Yes sir he did.

For the first two weeks of operation, Ms. Overman was the only prostitute at Sue Lynn's. Once the business was established, however, they were able to employ more than fifteen prostitutes and would generate as much as ten thousand dollars in receipts each week.

Ms. Overman testified that if any problems arose with regard to the operation of Sue Lynn's, employees would report to appellant. Appellant was also the person to see in order to get paid. She explained the manner in which the owners were paid.

Each week appellant would report the amount brought in by the business. He would deduct an amount for expenses such as utilities, linen bills, rent, the sheriff's payment, and the managers' salaries. Each manager received between five and seven dollars for every paying customer entering Sue Lynn's during his shift. In addition to those expenses Kurt Deals was paid 3–5% of the income. Overman explained that Deals was not a partner, but was paid this money for the use of his name on official business documents in order to shield appellant and his partners from any apparent involvement. After deducting all expenses, 25% of the net income went to Ms. Overman; 25% went to Melvin Grant; and 50% went to appellant and his wife.

Another witness called by the state was Lisa Deals, Kurt Deals' wife. They got married after she began working as a prostitute for Sue Lynn's. She generally described the manner in which she made money when employed at Sue Lynn's. Apparently the customer paid the manager a certain amount for a massage. He would choose a lady and go to a closed room. When Ms. Deals was chosen and taken to one of the bedrooms, she would explain how much of a "tip" the man would have to pay her in return for specific sexual acts. She could keep her tips but the manager would deduct certain amounts for fines, linen fees and credit card processing (ten dollars for each credit card charge). Additionally, she had to pay the management one hundred dollars a week to work at Sue Lynn's.

Another woman who worked as a prostitute for Sue Lynn's was Julie Kelly. She referred to appellant as her boss. During the two years she was employed at Sue Lynn's, she became pregnant and gave birth to a son. She worked "around the clock" six or seven days a week until she was six months pregnant. When her baby was four weeks old, she went back to work at Sue Lynn's.

On one weekend when her baby was seven weeks old, Ms. Kelly was scheduled to work from 9:00 p.m. Friday through 5:00

a.m. Monday. She had worked the whole weekend without any sleep, but on Sunday night at 10:00 p.m. she asked for permission to go home and breast-feed her son. The manager on duty, R.L. Matthews, gave her one hour to do so. According to Ms. Kelly's testimony, when she got home she passed out from exhaustion and did not return to work until approximately 3:00 a.m. Monday morning. Matthews fined her one hundred dollars for being late. After complaining to Kurt Deals, her fine was reduced to fifty dollars. Still distraught, she pursued the matter to appellant. With her baby in her arms she proceeded to appellant's residence, the trailer behind Sue Lynn's. Appellant was sitting on his porch drinking coffee. When he noticed Ms. Kelly he asked, "What the g— d— hell are you doing here? I told you never to come around my g— d— place." When she explained that she had two children and could not afford the fifty dollar penalty, he replied, "That's your g— d— problem, Julie." Then with his hand on his pistol he warned, "If you don't keep your g— d— mouth shut, I'll see to it you ain't around to raise your kids so don't worry about them." That was when Ms. Kelly quit working at Sue Lynn's.

Appellant presented no evidence at trial.

## II. MOTION TO SUPPRESS

Appellant, Kurt Deals, R.L. Matthews and a fourth man named Harrell were indicted for offenses relating to the prostitution business detailed above. Appellant had a separate trial on the merits but they all filed motions to suppress; and one hearing was held for this purpose. The suppression hearing was quite long, but the relevant results can be summarized by the following holdings of the trial court: (1) the search warrants were invalid because of their failure to comport with the standards of *State v. Jacumin,* 778 S.W.2d 430 (Tenn.1989); (2) the cash on appellant's person was illegally seized and must be suppressed; (3) appellant had no standing to challenge the search of Sue Lynn's; and (4) the warrantless search of the garbage dumpster was not barred by the Fourth Amendment as it was not an invasion of anyone's legitimate expectation of privacy.

### A. DID THE TRIAL COURT ERR IN ALLOWING ITEMS SEIZED AT SUE LYNN'S TO BE ADMITTED AT TRIAL?

■ We believe that the trial court ruled properly. During the motion to suppress, Detective Widener testified about his discussion with appellant and Kurt Deals on the day of the searches. Deals had claimed full ownership of Sue Lynn's, and appellant had denied any association or knowledge of the establishment. Appellant presented no evidence at the hearing to contradict or retract this information. Consequently, the trial court held that Deals had standing to contest the search of Sue Lynn's; and appellant did not.

The state contends that once appellant disclaimed ownership of the premises searched and the items seized, he was barred from claiming standing to contest the warrantless search. There is some authority to support the state's position. See *Kelley v. State,* 566 S.W.2d 858 (Tenn.1978) and *Miller v. State,* 520 S.W.2d 729 (Tenn. 1975) ("[Defendant] will not be permitted to revoke his disclaimer at his own convenience.") But see Lafave, *Search and Seizure* § 11.3(a) (1987) ("[I]t can hardly be said that the Fourth Amendment rights evaporate merely because of a failure to make incriminating admissions in response to police inquiries.") The *Kelley* Court referred to this as the "doctrine of disclaimer." We need not reach the merits of this doctrine as applied to the present case because we believe the trial court should be affirmed for other reasons.

■ From our reading of the cases in this area of the law, we believe that a defendant pursuing the suppression of evidence seized with either no warrant or an invalid warrant, has the burden of going forward with evidence of (1) the specific items he seeks to suppress and (2) an invasion of a legitimate expectation of privacy. See *State v. Burton,* 751 S.W.2d 440 (Tenn. Crim.App.1988). As discussed below, we believe appellant failed in both respects.

■ Under our Rules of Criminal Procedure, a defendant desirous of excluding evidence he believes to have been obtained by law enforcement officers in violation of a right guaranteed by the United States or Tennessee Constitutions must file a pretrial motion to suppress. Rule 12, Tenn. R.Crim.P. As with any other motion in the criminal courts of this state, a motion to suppress evidence must state with particularity the grounds upon which the motion is predicated. Rule 47, Tenn.R.Crim.P. Furthermore, in order to receive a hearing upon such a motion, the motion must be sufficiently definite to enable the trial court to determine whether a substantial claim has been presented. *State v. Burton,* supra.

Appellant's written motion sought to suppress "the property seized in this cause...." That document did not inform the court which items appellant sought to suppress. See *State v. Johnson,* 705 S.W.2d 681 (Tenn.Crim.App.1985). Perhaps as a consequence of this lack of clarity, the trial court asked counsel during the hearing on the motion to suppress which searches were being challenged. Counsel for appellant responded that he was challenging the search of appellant's person and seizure of the $5,173.00 in cash. The dialogue between the court and counsel was as follows:

The court: Alright. Mr. Dixon, as to Mr. Bell, what are you objecting to, which searches?

Mr. Dixon: The only thing that was seized from him and I believe it is the subject of this motion, is the cash.

The court: Cash on his person?

Mr. Dixon: Yes, sir.

The court: Alright. Now, at this point, go ahead and launch into your arguments as you have agreed to present them.

Mr. Dixon: As stated, we move the court to suppress for use as evidence the fifty-one hundred dollars seized from the person of Mr. Bell. We have filed a brief which cites two reasons....

Clearly, counsel expressed no desire to challenge the search of Sue Lynn's nor suppress the items seized therein. On at least two other occasions, during the suppression hearing, counsel inferred he was interested only in suppressing the cash. While cross-examining Detective Widener, counsel asked the following questions:

Q. Officer Widener, I represent Mr. Bell, what was it that you seized from him, his person?

A. I have a listed inventory of things seized, sir.

Q. I believe you returned—it was credit cards, and wallet, car keys and [driver's license]?

\* \* \* \* \* \*

A. Things of that nature.

Q. All those things were returned to him, weren't they?

A. Yes, sir. They were.

Q. And the subject of this motion is the cash that was taken from him?

A. Yes, sir.

Immediately after the hearing, the court ruled from the bench on the motions to suppress presented by the various defendants. The court granted appellant's motion to suppress the cash seized as result of the warrantless search of his person. The court also stated, among other things, that appellant had no standing to challenge the search of Sue Lynn's. This was surplusage because the court was doubtless under the belief that appellant was not challenging that search. Upon the court's announcement of his rulings, counsel for appellant took issue with one portion of the court's decision, but did not contest the court's statement with respect to the standing issue as it related to Sue Lynn's. We are not holding that a contemporaneous objection was necessary at this point because the court had already ruled. We merely point this out to illustrate appellant's consistent and apparently conscious decision not to challenge the search of Sue Lynn's.

We believe that the trial court granted appellant's motion as presented. The written motion was not specific, but at the hearing there was no question as to the items sought to be suppressed. The prop-

erty seized at Sue Lynn's was not among those items, and we are therefore unable to hold the trial court in error.

Approximately three weeks after the suppression hearing, the day before trial, appellant filed another motion entitled, "Motion to Suppress and/or to Modify the Previous Order of this Court Regarding Standing of the Defendant to Object to the Seizure of Property from Sue Lynn's." This motion was heard on the morning of trial. Appellant asserted in this motion that he had recently learned, through discovery, that the state may offer proof at trial that appellant "had a possessory interest of some kind in the business establishment known as Sue Lynn's." Thus, appellant requested that in the event the state did offer proof at trial of his ownership or other interest in Sue Lynn's, then at that time he would be declared to have standing to contest the search of that establishment. The trial court, quite properly we believe, refused to grant this motion.

■ We first stress that appellant has presented no authority to support his position that he should be able to postpone his assertion of standing until the facts developed to his benefit at trial. As noted earlier, motions to suppress must be presented prior to trial. Issues presented on appeal should be supported by appropriate citations of legal authority. Rule 10, Rules of the Court of Criminal Appeals. We acknowledge that the proof taken at a suppression hearing can be reopened or reconsidered, but the decision in this regard is left to the sound discretion of the trial court. We shall not interfere with that decision absent a showing that an injustice occurred as a result of the trial court's action. *State v. Moore,* 775 S.W.2d 372 (Tenn.Crim.App.1989).

■ Furthermore, appellant had every opportunity to exhibit his standing to object to the search of Sue Lynn's prior to trial. In order to object to the admission of illegally seized evidence the defendant must establish a legitimate expectation of privacy in the place searched. *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *State v. Harmon,* 775 S.W.2d 583 (Tenn.1989); *State v. Roberge,* 642 S.W.2d 716 (Tenn.1982); *State v. Crawford,* 783 S.W.2d 573 (Tenn.Crim.App.1989); *State v. Burton,* 751 S.W.2d 440 (Tenn. Crim.App.1988). Presumably appellant had access to the same documents as the state. Appellant made the tactical decision not to produce any information which would exhibit his association with Sue Lynn's. We do not question his tactical decision. We hold, however, that the time to litigate the standing issue was prior to trial; and absent extraordinary circumstances, we see no reason why the trial court should be found in error for following the dictates of our procedural rules.

The lower court committed no error in allowing the property seized at Sue Lynn's to be admitted in evidence and presented to the jury.

## B. DID THE TRIAL COURT ERR IN ALLOWING ITEMS SEIZED FROM THE GARBAGE DUMPSTER TO BE ADMITTED AT TRIAL?

■ Again, we are of the opinion that the trial court acted properly in its disposition of this issue. Rather than repeating the authority and reasoning discussed in the preceding section of this opinion, we note that appellant did not properly present this issue to the trial court during the hearing on his motion to suppress. We are also in agreement with the trial court that the evidence gathered from the garbage dumpster was not obtained in violation of the United States or Tennessee Constitutions.

It is well settled that the Fourth Amendment's procedural safeguards do not apply to police investigative activities unless those activities constitute a "search" within the meaning of the Fourth Amendment. Rather than defining the term search in a literal fashion, the Supreme Court has chosen to define a Fourth Amendment search as an invasion of a reasonable or legitimate expectation of privacy. See *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Hence, an investigation by governmental authorities which is not a search as defined by the Supreme

Court may be conducted without probable cause, reasonable suspicion or a search warrant.

In *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Supreme Court held that a police investigation of trash contained in opaque garbage bags and left by a public street for purposes of trash collection, did not constitute a search of the property and was not subject to Fourth Amendment scrutiny. A common summary of the Supreme Court's holding in *Greenwood* is that "the Fourth Amendment does not prohibit the warrantless search and seizure of garbage left for collection outside the curtilage of the home." See *United States v. Hedrick,* 922 F.2d 396 (7th Cir.1991). · In the present case, appellant seems to argue that the dumpster was within the "curtilage" of Sue Lynn's; and, therefore, *Greenwood* would not be of assistance to the state.

It is difficult to discuss this case by use of the term "curtilage" which has been defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life'." *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 1742, 80 L.Ed.2d 214 (1984) [quoting *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) ]. This is not to say that a person could not enjoy a privacy interest in a business establishment, even one such as Sue Lynn's; but the area around it does not likely enjoy the same "sanctity" and "privacy" as the property surrounding a person's home. Although *Greenwood* concerned a dwelling place, we have no difficulty in extending its holding in order to analyze the instant case. *Greenwood's* holding is accurately paraphrased by the Seventh Circuit in *Hedrick;* however, the Supreme Court clearly based its holding upon principles established in the earlier cases of *Katz v. United States,* supra, *Oliver v. United States,* supra. *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), and *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). These cases were cited as authority for the following proposition:

The warrantless search and seizure of the garbage bags left at the curb outside the Greenwood house would violate the Fourth Amendment only if respondents manifested *a subjective expectation of privacy* in their garbage *that society accepts as objectively reasonable.*

*Greenwood,* 486 U.S. at 39, 108 S.Ct. at 1628 (emphasis added).

The majority of the *Greenwood* court began its analysis by recognizing that the defendants probably expected their trash to be picked up by their trash collector, commingled with their neighbors' trash and then taken to the city dump. It was unlikely, the court acknowledged, that the defendants expected the contents of their garbage bags to become known to the police or other citizens. Without specifically stating so, the court conceded that the defendants enjoyed a subjective expectation of privacy in their discarded, yet uncollected, garbage. The court explained that an expectation of privacy does not give rise to the protection of the Fourth Amendment unless society is prepared to accept that expectation as objectively reasonable. The court concluded that "society would not accept as reasonable [defendants'] claim to an expectation of privacy in the trash left for collection in an area accessible to the public. . . ." *Id.* at 41, 108 S.Ct. at 1629.

Stating that the defendants exposed their garbage to the public sufficiently to defeat their claim of Fourth Amendment protection and concluding that they had no reasonable expectation of privacy in the inculpatory items they discarded, the court reasoned:

It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public. [citation and footnotes omitted] Moreover, respondents placed their refuse at the curb for the expressed purpose of conveying it to a third party, a trash collector, who might himself have sorted through Greenwood's trash or permitted others, such as police, to do so.

*Id.* at 40, 108 S.Ct. at 1628. As further explanation, the court declared, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id.* at 41, 108 S.Ct. at 1629. [quoting *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. at 511].

Applying this rationale to the present case we will, as did the court in *Greenwood*, assume for purposes of argument that appellant had a subjective expectation of privacy in the refuse contained in the garbage dumpster behind Sue Lynn's. The determinative question then is whether his expectation of privacy is one society is prepared to accept as objectively reasonable.

Detective Widener testified that the dumpster was in the parking lot where he and the search teams parked their van on the day of appellant's arrest. This was a parking lot for customers of Sue Lynn's. The dumpster had a lid and sliding doors, but the doors were open on the day in question. After hearing all the evidence, the trial judge found that the dumpster was on the outer "edge" of the property and the search was not a constitutional invasion of anyone's rights.

The proper focus under *Greenwood* is whether the dumpster and the contents thereof were readily accessible and likely to be seen by the public. The parking lot was open to all customers, and the doors to the dumpster were open. The financial success of Sue Lynn's, when it was in operation, was great. Consequently, there were many strangers visiting the establishment daily, and each had easy access to the dumpster.

We hold that the trial court did not err in failing to find a reasonable expectation of privacy in the garbage dumpster. Accordingly appellant's arguments regarding this issue are without merit.

C. DID THE TRIAL COURT ERR IN ALLOWING ITEMS SEIZED AT THE TRAILER TO BE ADMITTED AT TRIAL?

We are of the opinion that the question presented here need not be answered.

In light of the abundant evidence tending to incriminate appellant, the items found at the trailer added very little. Although the items appeared to show appellant's partial ownership of the building and premises of Sue Lynn's, the fact that appellant was the leader and organizer of this complex prostitution business was so well established by other testimony and documentary evidence that his ownership interest in the premises was of minor import.

Appellant was indicted and convicted of five counts of promoting prostitution. As to the first four counts, the law prohibiting this activity was reflected in T.C.A. § 39–2–626(b)(1) (Supp.1988):

> A person commits the offense of promoting prostitution in the second degree if he knowingly promotes prostitution by managing, supervising, controlling, or owning, either alone or in association with others, a house of prostitution or a prostitution business or enterprise involving prostitution activity by two (2) or more prostitutes.

The law changed in November of 1989 and appellant was indicted for the fifth count under the amended statute. "Promoting prostitution" is similarly defined under the new law which can be found at T.C.A. § 39–13–512(4):

> (4) "Promoting prostitution" means:
>
> (A) Owning, controlling, managing, supervising, or in any way keeping, alone or in an association with others, a business for the purpose of engaging in prostitution or a house of prostitution.

> \*     \*     \*     \*     \*     \*

As one can easily glean from these statutes, in order to be convicted of promoting prostitution, an accused need not be found to have owned the premises. Merely supervising or managing can lead to a conviction. In fact, the indictments themselves only refer to appellant's alleged management and supervision of Sue Lynn's.

We hold that even if it was error for the trial court to allow the state to show appellant owned the building in which Sue Lynn's operated and the premises upon which the building was situated, such error

was harmless beyond a reasonable doubt. We simply believe that the interest of justice would not be served by reversing appellant's convictions because the jury was allowed to learn of his ownership interest, when the evidence of his complicity with Sue Lynn's in other incriminating manners is so overwhelming.

We do not intend to give the impression that appellant's constitutional argument with respect to the search of the trailer is meritorious. In fact we reject appellant's contention for various reasons, most of which have already been explained in other portions of this opinion. We believe, however, that it is sufficient at this point to hold the trial court did not err; and even if it did, the error was harmless. Rule 52(a), Tenn.R.Crim.P.; Rule 36(b), T.R.A.P.

## III. SENTENCING

Two witnesses testified at the sentencing hearing, both called by the state. Kurt Deals was one of the witnesses.

Deals pled guilty to promoting prostitution, but his sentence was pending at the time of appellant's sentencing hearing. He was hired by appellant for the purpose of putting his name on official documents. He also acted as manager of Sue Lynn's at times. Deals was assured by appellant that the Sheriff of Blount County had been bribed, and there was no chance of trouble with legal authorities. In fact, appellant informed Deals that the sheriffs in Chattanooga and Sevierville had been "paid off" as well.

The prosecutor asked Mr. Deals whether he and appellant operated any houses of prostitution besides Sue Lynn's. His answer was affirmative. In the house next door to Sue Lynn's was a business called 129 Health Studio. It was a prostitution house originated and operated by appellant. Another facility engaging in the business of prostitution, called Brittany's, was also established by appellant. Appellant established another house in Sevierville, called Lacey's. Village Haven, another house of prostitution in Blount County, was owned and established by appellant. There were

others in Chattanooga and Fort Lauderdale, Florida.

After the raid of Sue Lynn's, appellant instructed Deals to inform authorities that appellant was only a friend and that he, Deals, was the owner and operator of the business.

Deals testified about some of the fruits of appellant's business ventures. He had seen appellant with two new Cadillacs, a late model Mercedes Benz, an older model Mercedes, and a Chrysler New Yorker. His wife had a luxury sports car and a boat in Chattanooga. Deals testified about appellant's three condominiums in Florida. The two also participated in the use of cocaine on many occasions over the two-year period prior to trial. This contradicted appellant's statement in his probation report that he had never used any illegal drugs except marijuana once in 1972.

The other witness to testify at the sentencing hearing was Marcus Miller, a probation officer with the Tennessee Department of Correction. Appellant was very uncooperative with the preparation of the presentence report. He claimed to have been instructed by counsel not to make any statements, apparently because of other pending charges or investigations. We find it odd, however, that appellant even refused to provide any information about prior work history. He would only state that he was in the "home improvement field." He also refused to sign any waiver forms so the probation officer could obtain information about past employment history. Even if appellant had a valid Fifth Amendment argument during the sentencing phase of this trial, we fail to see how providing such information would be incriminating.

As for appellant's criminal record, he had been charged with various offenses in Hamilton County in 1988 and 1989. He was convicted of possessing cocaine in May of 1988 and received a sentence of six months unsupervised probation.

The court sentenced appellant to two years on each of his five convictions and ordered them to be served consecutively for an effective sentence of ten years. The

court also ordered appellant to pay a fine of $3,000.00 as recommended by the jury. The court denied appellant's request for probation.

■ Appellant, whose sentencing hearing took place in March of 1990 for offenses committed between 1987 and 1989, was sentenced under the Criminal Sentencing Reform Act of 1989. T.C.A. § 40–35–117(b). The trial court's determinations concerning sentencing carry a presumption of correctness.

\* \* \* \* \* \*

■ When considering the issue of probation, the trial court as well as this Court considers the nature and circumstances of the offense or offenses, the defendant's criminal record, the defendant's social history, the defendant's present mental and physical condition, the deterrent effect upon other criminal activity, and the likelihood that probation will serve both the public and the defendant's best interests. *Stiller v. State*, 516 S.W.2d 617 (Tenn. 1974); *State v. Biggs*, 769 S.W.2d 506 (Tenn.Crim.App.1988); T.C.A. § 40–35–303.

The facts in this case are similar to those in *State v. Charlton*, 746 S.W.2d 467 (Tenn.Crim.App.1987), where this Court held probation should be denied because of the nature and circumstances of the offense and our opinion that incarceration was necessary to ensure both specific and general deterrence. We add in this case that probation would not be in the best interest of society. Furthermore appellant's criminal record, although not extensive, certainly does not reflect a clean slate. As for appellant's social history, his failure to cooperate with his probation officer resulted in very little information in this area.

The state established that appellant owned or operated at least seven houses of prostitution which appears to have made him a wealthy man. He operated Sue Lynn's as if it were a modern, legitimate business: it accepted major credit cards, had a bank account, advertised in local newspapers, and had well-defined rules for the prostitutes and managers. He employed at least fifteen prostitutes at Sue Lynn's alone; and he grossed as little as $6,000.00 a week and at times more than $10,000.00 a week from Sue Lynn's business. Appellant attempted to shield himself from criminal prosecution by bribing law enforcement officials. He tried to insulate himself from criminal liability by placing the business permits and other documents under the name of Kurt Deals, and then instructed Deals to lie about his involvement once the criminal activity was uncovered.

Appellant's criminal record shows that he was indicted for three offenses that took place in 1988: possession of cocaine; possession of a gambling apparatus; and possession of marijuana. Pursuant to a plea bargain, appellant pled guilty to the charge of possessing cocaine; and the other charges were dropped.

No evidence was presented at the sentencing hearing by appellant. He has clearly failed to meet his burden of establishing an entitlement to probation.

■ The final issue presented for our consideration is whether the trial court erred by ordering appellant's five sentences to be served consecutively. A review of T.C.A. § 40–35–115 assures this Court that the trial judge did not err. That statute provides in pertinent part:

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive.

T.C.A. § 40–35–115(b)(1) is essentially a codification of the Supreme Court's definition of a professional criminal. In *Gray v. State*, 538 S.W.2d 391 (Tenn.1976), the Court directed that consecutive sentencing be reserved for certain categories of offenders such as professional criminals. Appellant was given the opportunity to show that his wealth was derived from a source other than his criminal activity, but he refused to provide any information

about his employment history. A preponderance of the evidence certainly shows that appellant was a professional criminal as that term is defined by the statute.

The trial court did not apply T.C.A. § 40–35–115(b)(2) as a means of invoking consecutive sentencing, but we believe that it would have been appropriate to do so in this case. The evidence supporting appellant's convictions show that his criminal activity was so extensive as to warrant consecutive sentencing.

## IV. CONCLUSION

We have thoroughly considered the record, briefs and oral arguments presented by the parties and are unable to find any reversible error. Accordingly, the convictions and sentences entered by the trial court are affirmed in all respects.

BIRCH, J., and WILLIAM H. INMAN, Special Judge, concur.