# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 27, 2012

## STATE OF TENNESSEE v. JERMAINE JOHNSON

**Interlocutory Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1381     Monte Watkins, Judge**

---

**No. M2012-00391-CCA-R9-CD - Filed March 26, 2013**

---

The Defendant-Appellee, Jermaine Johnson, was indicted for one count of possession with intent to sell or deliver .5 grams or more of cocaine in a drug-free zone. The trial court granted in part and denied in part Johnson's motion to suppress evidence. Pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, we granted the State's interlocutory appeal challenging the trial court's suppression of 14.5 grams of cocaine found near Johnson, and we granted Johnson's cross-appeal of the denial of his motion to suppress 1.43 grams of cocaine found on him. Upon review, we affirm the partial denial of Johnson's motion, reverse the court's decision to suppress evidence, and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court Affirmed in Part and Reversed in Part**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and CHRISTOPHER (CHRIS) CRAFT, SPECIAL JUDGE, joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton , Assistant Attorney General; Victory S. (Torry) Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the Appellant, State of Tennessee.

Jodie A. Bell, Nashville, Tennessee, for the Defendant-Appellee, Jermaine Johnson.

## OPINION

On September 3, 2010, the Crime Suppression Unit of the Metropolitan Nashville Police received a complaint of drug activity in the area of Lewis Street in Nashville, Tennessee. Officers responded and conducted surveillance in the area. They observed the Defendant-Appellee, Jermaine Johnson, and another man, Mr. Hudson, in the parking lot.

One officer approached Johnson and found 1.43 grams of cocaine and $609.00 in cash on him, and another officer found a bag of 14.5 grams of cocaine "near" Johnson in the parking lot. Johnson was arrested and subsequently indicted for one count of possession with intent to sell or deliver .5 grams or more of cocaine in a drug-free zone. He filed a motion to suppress any and all evidence derived from his detention, search, and warrantless arrest.

Following a hearing, the trial court found that the officer had reasonable suspicion to stop Johnson. The court denied Johnson's motion to suppress the 1.43 grams of cocaine and money found on his person. However, the court summarily determined that there was not "[a] sufficient nexus established between the bag of cocaine found in the parking lot and the [D]efendant[.]" Consequently, the court granted Johnson's motion to suppress the 14.5 grams of cocaine recovered from the parking lot. This Court granted the State's untimely filed application for permission to pursue an interlocutory appeal as well as Johnson's application for permission to appeal.

**Motion to Suppress**. At the hearing on the motion to suppress, Detective Vickie Dills testified for the State, and Johnson and his girlfriend, Adrian Frank, testified for the defense. Only an aerial map of the parking lot was entered into evidence.

Detective Dills testified that on September 3, 2010, she was working for Hermitage Crime Suppression Unit of the Metropolitan Police Department in Davidson County with Detectives Smith and Jenkins. She said after they received a complaint of drug activity "near" 727 Lewis Street, the three officers drove their unmarked police car to Lewis Street to conduct surveillance in the area, which was known for drug trafficking.

Upon arrival, Detective Dills observed "two gentlemen walking away from the 727 Lewis Street area." She said the two men "went in opposite directions and kind of split up," and further opined that the men "didn't want to be caught together." Detective Dills testified that Johnson "went . . . on the other side of the parking lot and Mr. Hudson went to the lower side of the parking lot." She said a bag of 14.5 grams of cocaine was found "[o]n the upper side of the parking lot, near where Johnson was."

Detective Dills testified that when the officers exited their car, they were "in [their] raid gear, clearly identified as police." She said she

> called to [Johnson] and asked him if [she] could talk with him for a second. He walked over and said "yes." [Detective Dills] asked him what he was doing and he said "nothing." Then [Detective Dills] asked him if he had anything on him and he said "no." [Detective Dills] asked him if [she] could search him and he said "yes." He raised his arms up (indicating).

-2-

Detective Dills found "a dollar bill with one point three grams of cocaine inside of it" in Johnson's right coin pocket and six hundred nine dollars in "smaller denominations" on him.

Detective Dills said Detective Jenkins then "called out from the other side of the car and said that he had found a larger baggy of cocaine," which subsequently field-tested positive for cocaine base. Detective Dills testified that Johnson was "[a]bout four or five feet" from where Detective Jenkins held up the cocaine. Detective Dills then advised Johnson of his Miranda rights, and he stated that "he only smokes."

Detective Dills testified that Detective Jenkins observed Johnson "making a throwing motion with his hand whenever he was walking" when the officers pulled up and got out of their vehicle. She agreed that it was at the moment that she got out of the unmarked police car with her raid vest on that the two men split up, and she agreed that "the dope was found in that same direction that the defendant went."

On cross-examination, Detective Dills agreed that the sole reason the officers were in the Lewis Street area was in response to the call about drug activity and that she did not see Johnson do anything illegal, "make any movements towards" her, or "act threatening." She also acknowledged that she did not take photographs, ask Johnson to sign a consent form, or record her conversation with Johnson. She said it was Detective Jenkins's responsibility to write the offense report. She agreed that the case file did not state that Johnson consented to a search.

Detective Dills said after she spoke with Johnson, Detective Jenkins "described something being tossed" and "told [her] that he did see what appeared to be throwing." She denied that Detective Jenkins reported seeing just "an item flying through the air." She said she did not see Johnson the entire time, because she was in the back seat of the car which "slightly obstructed" her view.

Detective Dills testified that Johnson appeared "nervous" and that after she found the cocaine wrapped in the dollar bill in his pocket, she placed him in handcuffs. She could not recall whether she had found the cash, which consisted of five, ten, and twenty-dollar bills, prior to handcuffing him.

On re-direct examination, Detective Dills testified that the police department had "recovered a lot of weapons from the area, lot of drugs. There's been a lot of shootings, stabbings in the area." She testified that in high crime areas, such as Lewis Street, a trained officer is looking for "hand movements," to see if an individual has a weapon or drugs.

Ms. Adrian Frank testified that on September 3, 2010, Johnson, her boyfriend, received a phone call from Ms. Dana, who told him to come pick up some shirts she had for him. Ms. Frank said that Johnson, driving Ms. Frank's car, backed into a parking space at Ms. Dana's residence. Ms. Frank said she waited in the car for "at the most, five minutes" and saw Johnson coming from the residence towards her car. She did not see Johnson drop anything. Ms. Frank saw the unmarked police car "fly down the drive backwards" and stop behind her car. She testified that one officer stopped Johnson "on his way to get in the car" and looked in his bag of shirts and asked him if she could talk to him. She said she had both windows down but did not hear the officer ask Johnson for permission to search. She testified that the officer "was asking how he was doing and stuff and [she] heard him, [say] 'okay,' but . . . [she] really didn't hear much of a conversation." Ms. Frank thought Johnson "didn't have a choice" about "engag[ing] in that encounter" with Detective Dills, because there were "three policemen . . . swarming that area and they called and they stopped him at the car and asked to talk for a minute."

On cross-examination, Ms. Frank said she saw Johnson and Hudson walking together and then saw them go in different directions when Johnson started towards her car. She turned around to watch the police officers speed down the alley, stop behind her car, and exit. A male police officer talked to her at the passenger window and shined a flashlight inside her car but did not search it. She acknowledged that Detective Dills did not hold a gun on Johnson and that Johnson replied, "Yes, I can talk to you." She saw Johnson gesture to Detective Dills, and she agreed that Johnson raised his arms before Detective Dills searched his pockets.

Johnson testified that he was raised in the Lewis Street area, has family there, and visits "about three or four times a month." He said Ms. Dana, who lived at 727 Lewis Street, called and asked him if he was "going to come and get them shirts," and on September 3, 2010, he drove to pick up the shirts. He said he backed in and parked facing the "project wall," and "Ms. Dana was sitting on her porch, and the bag was hanging on the rail." He said he grabbed the bag of shirts and talked with Ms. Dana "for a couple of minutes," and as he walked back across the parking lot to the car, where Ms. Frank was waiting, he saw a car "shoot up the driveway" backwards. He said he did not know it was a police car, because it is "not uncommon" for cars to drive backwards at a high rate of speed there. But after Detective Dills "jump[ed]" out of the car which was parked behind his, he knew she was a police officer.

He testified Detective Dills "asked [him], could she–told me to come there, could she talk to me." He said "the other people ran," but he "left the [driver's side car] door open and walked straight to her." She asked him what he was doing and what was in his bag. He said he was not doing anything, was getting in his car to leave, and had shirts in his bag. He

threw the bag of shirts onto the trunk of the car and raised his hands. He said she searched the bag and asked if he had identification with him, and he pulled out his billfold and handed her his identification. She asked him if he had any drugs, weapons, or anything she needed to know about on him, and, with his arms raised, he said, "I don't have anything on me." When she patted his pockets, he said, "I'm going to be honest with you now. . . . What I do have on me is a dime of powder." After Detective Dills handcuffed him, she discovered the money in his billfold, and Detective Jenkins found the bag of cocaine. Johnson told the officers they "need[ed] to fingerprint that bag, that don't belong to me." Detective Dills read him his Miranda rights. Johnson said he would "tap" cocaine powder and smoke marijuana, but he did not "deal with crack cocaine." He said he did not give the officer permission to search him.

Johnson acknowledged that he had a twenty-one-year-old second degree murder conviction. On cross-examination, he said he used drugs but did not sell them. When the State asked if he agreed that he had four convictions for possession and exchange of drugs, he said he did not "know what that exchange is" but he "pleaded guilty of those things because [he] was guilty." He said Detective Dills only touched his pockets but that he considered that a search.

By written order, the trial court determined that there was reasonable suspicion supporting the investigatory stop of Johnson; therefore, the search of his person revealing 1.43 grams of cocaine and $609.00 was valid. The trial court further determined, without elaboration, that the nexus "established between the bag of cocaine found in the parking lot and the defendant" was not sufficient. Accordingly, the trial court denied Johnson's motion to suppress the evidence seized from his person and granted Johnson's motion to suppress the drugs seized from the parking lot. This appeal followed.

## ANALYSIS

In its appeal, the State contends that the trial court erred in applying the nexus doctrine to the cocaine found in the parking lot and that its retrieval did not constitute a search. In response, Johnson asserts that the trial court properly applied the nexus doctrine in suppressing the evidence. In Johnson's cross-appeal, he argues the trial court erred in failing to find that [Johnson was] unlawfully detained when he came into contact with Officer Dills and erred in concluding that [Johnson] consented to a search of his person. The State counters that the trial court correctly analyzed Detective Dills's encounter with Johnson. We agree with the State in both appeals.

An appellate court may consider the proof presented at the suppression hearing and the trial when determining whether the trial court properly granted or denied a motion to

suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). It is well-established that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The Tennessee Supreme Court explained this standard in Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Id. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)). The defendant bears the burden of showing that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 23; Yeargan, 958 S.W.2d at 629.

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. A warrantless search or seizure "is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

"Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search." State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). "'[T]he "plain view" exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be.'" State v. Niles, No. M2011-01412-CCA-R3-CD, 2012 WL 1965438, at *11 (Tenn. Crim. App. June 1, 2012) (quoting Washington v. Chrisman, 455 U.S. 1, 5-6 (1982)). "The plain view doctrine is applicable when (1) the object seized was in plain view, (2) the viewer had a right to be in the position to view the object, and (3) the incriminating nature of the object was immediately apparent." Id. (citing State v. Cothran, 115 S.W.3d 513, 524-25 (Tenn. Crim. App. 2003)). We conclude that the bag containing over fourteen grams of cocaine was in plain view of the officers in the parking lot and did not require a warrant. Furthermore, its retrieval did not constitute a search. See State v. Ross, 49 S.W.3d 833, 839

(Tenn. 2001) ("'[A]n investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion or a search warrant.'")(quoting State v. Bell, 832 S.W.2d 583, 589-90 (Tenn. Crim. App.1991)).

Additionally, "when evaluating whether a particular defendant's Fourth Amendment rights have been violated, we look to two inquiries: (1) whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' and (2) whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable."'" State v. Ross, 49 S.W.3d at 840 (quoting Katz, 389 U.S. at 361) (Harlan, J., concurring)). We have previously determined that a co-owner of residential property, who did not reside on the property, did not have an actual, subjective expectation of privacy in its parking lot or in an opening in the structure's foundation, "which was used to gain entrance to the area beneath the structure" and which did not have a "door or covering." State v. Matthews, 805 S.W.2d 776, 780 (Tenn. Crim. App. Aug. 22, 1990). Additionally, we concluded that "society is not willing to accept an expectation of privacy in (a) a parking lot which is provided for the use of tenants and their guests or (b) an area under a rooming house which does not have a door or other means to secure the area and is not being used either by the owner or tenants to store personal property." Id. at 781; accord California v. Greenwood, 486 U.S. 35, 39 (1988) (concerning the "warrantless search and seizure of the garbage bags left at the curb outside the . . . house"), quoted in State v. Bell, 832 S.W.2d 583, 590 (Tenn. Crim. App. 1991); United States v. Diaz, 25 F.3d 392, 396 (6th Cir. 1994); State v. Levi Battle, III, No. M2006-00288-CCA-R3-CD, 2007 WL 957207, at *4 (Tenn. Crim. App. Mar. 29, 2007) ("Defendant had no reasonable expectation of privacy when he parked his car in the hotel parking lot."); State v. Jose Roberto Ortiz, No. M1998-00483-CCA-R3CD, 1999 WL 1295988, at *16 (Tenn. Crim. App. Dec. 30, 1999) (concluding defendant "did not possess any expectation of privacy in the parking lot of [another's] apartment complex."); see also Chico v. State, 394 S.W.2d 648, 651 (Tenn. 1965) ("The law is settled that when the land on which the evidence is found is not possessed as a part of the curtilage or used in the daily operation of the premises, then the constitutional provision against unreasonable searches and seizures does not apply."). Under these authorities, we conclude that Johnson did not have a subjective expectation of privacy in the parking lot and that society is not prepared to recognize as "reasonable" an individual's expectation of privacy in such a lot. Matthews, 805 S.W.2d at 781. Because Johnson did not have a reasonable expectation of privacy, he was without standing to challenge the actions of the officers. Accordingly, the question as to whether the search and seizure was reasonable is moot. Id. at 780.

The trial court granted Johnson's motion as it relates to the 14.5 grams of cocaine, because it found an insufficient "nexus" between the cocaine and Johnson. Under Fourth Amendment law, the nexus doctrine applies to search warrants and instructs that

An affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched. The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence.

State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993) (citations omitted). Because the validity of a search warrant is not at issue, the nexus doctrine does not apply. Furthermore, as the State notes, in the context of warrants, a nexus is required between the place to be searched and the evidence to be seized, not between the suspect and the evidence.

The Defendant cross-appeals the trial court's denial of his motion to suppress the cocaine and cash found on him. He contends that the trial court erred in finding that Detective Dills had reasonable suspicion to stop Johnson and that he consented to the search. The State asserts that the "trial court correctly analyzed Detective [Dills's] encounter with [Johnson]." We conclude the evidence does not preponderate against the trial court's determination that the investigatory stop was supported by reasonable suspicion and that Johnson voluntarily gave consent to search his person.

A warrant is not required for an investigatory stop if the officer has "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn.1997) (citing Terry v. Ohio, 392 U.S. 1, 21, (1968)). Probable cause is not required for an investigatory stop. State v. Coleman, 791 S.W.2d 504, 505 (Tenn. Crim. App. 1989) (citing Terry, 391 U.S. at 27 and Hughes v. State, 588 S.W.2d 296, 305 (Tenn.1979)). The Tennessee Supreme Court has stated that a "[r]easonable suspicion is a less demanding standard than probable cause." Bridges, 963 S.W.2d at 492 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). Reasonable suspicion for an investigatory stop will be found to exist only when the events which preceded the stop would cause an objectively reasonable police officer to suspect criminal activity on the part of the individual stopped. State v. Levitt, 73 S.W.3d 159, 172 (Tenn. Crim. App. 2001); State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996). The likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause, and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. United States v. Sokolow, 490 U.S. 1, 7 (1989); see also State v. Keith, 978 S.W.2d 861, 867 (Tenn. 1998). Determining whether reasonable suspicion exists requires consideration of "the totality of the circumstances":

Circumstances relevant to the evaluation include, but are not limited to, the officer's personal objective observations, information obtained from other

-8-

police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. A court must also consider the rational inferences and deductions that a trained officer may draw from the facts and circumstances known to him—inferences and deductions that might well elude an untrained person. Finally, the content, quality, and quantity of information possessed by police must be assessed in determining whether it is sufficiently reliable to support a finding of reasonable suspicion.

State v. Keith, 978 S.W.2d 861, 867 (Tenn. 1998) (citations omitted).

"While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007) (quoting State v. Nicholson, 188 S.W.3d 649, 656 (Tenn.2006) and citing State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000)). "'[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" Id. (quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)).

Based on the above authority, we conclude that the trial court did not err in finding that Detective Dills had a reasonable suspicion to stop Johnson and that Johnson voluntarily answered both questions posed by Detective Dills. The evidence at the hearing established the following: (1) the Lewis Street area was known for drug activity; (2) the officers had received "a complaint of drugs being sold on Lewis Street;" and (3) in their surveillance of the area, the officers saw "[Johnson] . . . walking with another individual and split up once they were being approached by police officers." Both Johnson and Ms. Franks testified consistently with Detective Dills that she asked Johnson if she could talk to him, that Johnson responded affirmatively, and that he raised his arms prior to her search. The record fully supports the trial court's determination that reasonable suspicion supported the stop, that Johnson provided a voluntary response to police questioning, and that Johnson consented to the search. Johnson is not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed in part and reversed in part. The court's denial of Johnson's motion to suppress is affirmed, and its suppression of evidence is reversed. This case is remanded to the Davidson County Criminal Court for proceedings consistent with this opinion.

_____
CAMILLE R. McMULLEN, JUDGE