IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 9, 2011 Session

## STATE OF TENNESSEE v. WILLIAM A. OSBORNE

**Direct Appeal from the Criminal Court for Sumner County**
**No. 73-2010     Dee David Gay, Judge**

_____

**No. M2010-02412-CCA-R3-CD - Filed April 5, 2012**

_____

A Sumner County jury convicted the Defendant, William A. Osborne, of three counts of facilitation of aggravated burglary, one count of facilitation of theft of property between $500 and $1000, one count of theft of property between $500 and $1000, and one count of theft of property between $1000 and $10,000.  The trial court sentenced him as a career offender to an effective sentence of thirty-six years, to be served at 60%.  On appeal, the Defendant contends that: (1) the trial court erred when it denied the Defendant's motion to suppress; (2) the trial court erred when it allowed the jury to find the Defendant guilty on Count 1 after the jury had previously announced it could not unanimously agree as to Count 1; (3) the trial court erred when it failed to declare a mistrial following prejudicial statements made by the State's witnesses; (4) the evidence at trial was insufficient to sustain his convictions; and (5) the trial court erred in sentencing the Defendant.  After a thorough review of the record and applicable law, we conclude that there exists no error in the judgments of the trial court, and we affirm those judgments.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Russell E. Edwards, Hendersonville, Tennessee, for the appellant, William A. Osborne.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; L. Ray Whitley, District Attorney General; Lytle Anthony James, Assistant District Attorney General for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's involvement in three home burglaries, which occurred in early March 2009. For these events, a Sumner County Grand Jury indicted the Defendant for three counts of aggravated burglary, two counts of theft of property more than $1000, one count of theft of property more than $500, and one count of vandalism less than $500.

**A. Suppression Hearing**

The Defendant filed a motion to suppress evidence police found as a result of searching for a blue Honda that police observed the Defendant exiting. The trial court held a hearing, and the following evidence was presented at the suppression hearing: Ben Brown, an officer with the Franklin City Police Department in Franklin, Kentucky, testified that on March 5, 2009, he was patrolling a "high-crime area" in Franklin. At approximately 8:30 p.m., Sergeant Brown observed a blue Honda back into a driveway between two residences on Jackson Street and the Defendant exit the vehicle. As he turned onto the street leading toward the driveway, he saw the Defendant standing next to the vehicle. When the Defendant saw the marked police cruiser, he "froze, turned and quickly walked back between the residences, . . . away from the area and walked back in the shadows."

Sergeant Brown testified that he found the Defendant's response to seeing the police car "suspicious" and that, based upon his experience, it appeared that the Defendant was going to "attempt to flee the area." Sergeant Brown drove around the block hoping to find the Defendant, but, when he did not, he returned to the location of the blue Honda. Sergeant Brown approached the blue Honda and smelled a strong odor of marijuana coming from the partially open windows of the vehicle. After canvassing the immediate area, without finding the Defendant, Sergeant Brown checked the vehicle tag, which had expired in 2000. Sergeant Brown also learned that the vehicle tag did not match the vehicle. Based upon the Defendant's behavior, the expired registration, and the vehicle tag which did not match the vehicle, Sergeant Brown suspected it was a stolen vehicle.

Sergeant Brown observed the VIN ("Vehicle Identification Number") through the windshield but could not see the entire number because trash obstructed his view. The vehicle was unlocked, so Sergeant Brown entered the vehicle and cleared the trash so he could see the entire VIN. Sergeant Brown also looked in the vehicle's glove compartment for registration papers. He did not find any registration papers, but he did find a rental agreement for the property located next to the parked vehicle and a gas bill that both bore the name "Brandy Biggs." While looking in the glove compartment, Sergeant Brown observed marijuana seeds and marijuana residue.

-2-

Sergeant Brown testified that, after finding the marijuana, he believed he had uncovered a crime involving illegal narcotics, so he searched the vehicle. He explained he did not seek a search warrant because he would have had to leave the car unattended while filing the necessary paperwork. During the sergeant's search of the vehicle, he found, in addition to the marijuana seeds and residue, a large knife and a box of ammunition for a .380 caliber handgun in the interior of the vehicle. In the trunk of the vehicle, Sergeant Brown found six shotguns and rifles. Sergeant Brown located the serial numbers on the guns and confirmed that at least two of the guns were reported stolen. At a later time, three more of the guns were confirmed stolen.

Sergeant Brown testified that he later executed a search warrant for the residence located next to the parked vehicle, which was the subject of the rental agreement he found in the glove box of the vehicle. Police found electronic equipment, stereos, power tools, a cross bow, and "various odds and ends that were stacked up in the residence." Later, police confirmed that some of the property had been reported stolen. Sergeant Brown also found a picture of the Defendant and a woman he identified as "Brandy Biggs" in the residence.

Based upon this evidence, the trial court denied the Defendant's motion to suppress, finding that the Defendant had no standing to challenge the search of the vehicle and that Sergeant Brown had probable cause to search the vehicle.

**B. Trial**

At the Defendant's trial on the charges, the parties presented the following evidence: Lauren Stewart testified that her home was burglarized on March 4, 2009. Ms. Stewart recalled that, on this day, she went to work in downtown Nashville, and, at about 10:00 a.m., she received a phone call from her uncle, Dewayne Sircy, who lived approximately a half a mile behind her house. Ms. Stewart's uncle notified her that her home had been burglarized. Ms. Stewart left work and drove home where police officers were already investigating the burglary. The front door of the house was "busted open," and the entire living room was in disarray. Ms. Stewart described her living room as "shocking," saying, "It looked like something out of a movie, like when you see someone's house ransacked in a movie." In Ms. Stewart's bedroom, the bed mattress was flipped over and the contents of her dresser drawers were dumped on the floor.

Ms. Stewart testified that her DVD collection, CDs, DVD player, two laptop computers, her digital camera, and jewelry were stolen. She estimated that eighty DVDs were stolen for which she paid an average of $10 each. She testified that her Apple laptop computer was worth $1900, and she had purchased about $1000 worth of graphic design software programs for school that were downloaded onto the computer. Ms. Stewart testified

that her other laptop computer was "older" and purchased for "around [$]2000," but she estimated the worth of an equivalent laptop now at $850 to $1000. Ms. Stewart valued the digital camera at $300 and the total value of the jewelry stolen at $2000. In addition, Ms. Stewart said that a bottle of washing detergent, Clorox, and two cases of Coke were stolen from her home that day.

Ms. Stewart testified that, several days later, she received a phone call regarding her missing items. She drove to Franklin, Kentucky, and was able to identify some of the items stolen from her home. Ms. Stewart testified that the aggregate value of the property stolen was over $500.

Dewayne Sircy, Lauren Stewart's uncle, testified that he lived about 1400 feet directly behind Ms. Stewart's home. On March 4, 2009, he was upstairs in his home when he heard his dog barking. He looked out the window and saw a car parked in Stewart's driveway. He continued to watch as three individuals got out of the car and walked to the back of Stewart's house. One of the individuals went to the door while the other two went to windows. Sircy thought this was odd, so he decided to go to Stewart's to see if she was having work done to her house. It was early in the morning, so Sircy dressed, went outside, and got in his car. As he started down the driveway, he saw the car leaving Stewart's house.

Mitchell Curry testified that his home had been burglarized on March 2, 2009. He recalled that, on that day, he had returned home from work when he noticed the front door was open. He assumed his roommate had left the door ajar, so Curry went inside. Once inside, he saw that his computer was missing, so he began going from room to room in the trailer. He described the rooms as "ransacked, drawers thrown everywhere, cabinets ripped out, clothes, bed sheets ripped off the beds, beds tossed in the floor." Curry said that he owned three guns that he kept in a locked gun cabinet in his bedroom closet. He found the gun cabinet lying on his bed, pried open, with the three guns missing. The replacement cost of the gun cabinet was $150, and he estimated a $900 total value for the three stolen guns: a Remington 870 shotgun, a Marlin 336 rifle, and a Glock 22 pistol. Ammunition and a gun cleaning kit, worth $60 in total, were also taken during the burglary. Curry estimated the value of his laptop computer at $800. Curry agreed that the aggregate value of the property stolen was "easily over $1000." Curry denied giving anyone permission to enter his house or take any of the missing items.

James Jones, Matthew Curry's roommate, testified that he owned a .22 rifle, a 16-gauge shotgun, a knife case with multiple knives, a circular saw, and a class ring, all of which were stolen during the burglary. He estimated that the guns were worth $150 each, the class ring between $250 and $300, and the circular saw about $60. He could not place a value on the knives because he had been collecting them for "several years." Jones said

-4-

that he recovered some of the items from the Franklin Police Department. Jones testified that he did not give anyone permission to enter the trailer or take any of the missing items.

Josephine Shuler testified that, when she and her husband entered their home after returning from lunch with their son, she noticed a drawer from a washstand that sits near the back door was set on the floor. When her husband denied any knowledge of moving the drawer, Ms. Shuler called the police, believing they had "been robbed." She followed her husband upstairs to the bedrooms and found two of the bedrooms in complete disarray. She recalled that the rooms "looked like a hurricane had hit [them]." Drawers were pulled out of the dressers and dumped on the floor, mattresses thrown off the beds, and houseplants dumped on the floor. The master bedroom appeared undisturbed except for the dresser drawers which were opened. Ms. Shuler testified that approximately $3500 worth of her jewelry and some pistol and shotgun shells were missing. She identified and recovered some of the items from the Franklin Police Department. Ms. Shuler denied giving anyone permission to enter her home or take her jewelry and the gun ammunition.

Ivan Pyne, an Academy Sports store manager, testified that he provided police with video surveillance footage that depicted the Defendant, on March 3, 2009, purchasing a box of 40 Smith & Wesson 180-grade ammunition from the gun counter at the Rivergate Academy Sports store.

Nathan Oakes, an associate at Berry's Jewelry & Loan in Madison, Tennessee, provided transaction documents for March 4 and 5, 2009. The documents showed that Timothy Peden, a co-defendant in this case, pawned four jewelry items and eighty-three DVD movies. Oakes explained that, subsequently, these items were placed on hold and confiscated by the police.

Timothy Peden testified that he was prepared to participate in the trial as a co-defendant, but he had changed his mind and entered into an agreement with the State as to the disposition of the charges against him. The agreement required that Peden "tell the truth" in exchange for a fifteen-year sentence to be served at 60%. Peden admitted that he lied to police during previous interviews. Peden agreed that he had a "very long" criminal history including numerous aggravated burglaries and theft convictions. Peden agreed that he had additional outstanding warrants for burglaries in other counties.

As to the general approach taken to the burglaries, Peden explained that he, the Defendant, and Biggs would find a "suitable home" where there were no cars in the driveway. Someone would knock on the door and if no one answered, they would "bang" on the back door and windows. If still no one answered, the group would "kick in" or pry open the door. Once inside, they would move quickly, ransacking the house to find valuable

items, put those items in a bag, and leave. After burglarizing the home, Peden said that they would split up the stolen items. At the time of these burglaries, Peden was actively using cocaine, and he would sell his items to drug dealers in exchange for cocaine.

Peden testified that the three homes burglarized were all located in Sumner county. After burglarizing a home, they took the stolen items to Franklin, Kentucky, where the Defendant and Biggs lived. Peden said that he went to the Kentucky house on two occasions. While there, he said they would drink beer, he would smoke crack cocaine, and the group would sift through the stolen items to determine what was of value.

Peden testified that on March 2, 2009, he, the Defendant, and Biggs burglarized a trailer in Sumner County. Peden recalled that they found a gunsafe in one of the bedrooms. He said that they laid the gunsafe on the bed and broke it open to reveal a .40 caliber gun, rifles, and a gold class ring. While opening the safe, a shelf fell and hit Peden in the face leaving a cut. Peden said that he put a T-shirt on the wound to keep any blood, which might be traceable, from falling onto the floor. Peden said that he did not wear gloves during that burglary but that the Defendant and Biggs wore gloves.

Peden testified that on March 3, 2009, he, the Defendant, and Biggs went to an Academy Sports store. The State played surveillance video footage from the store, and Peden identified Biggs, the Defendant, and himself. Peden also identified the Defendant as the person buying ammunition for the .40 caliber gun stolen from the trailer at the checkout counter of the store.

Peden testified that on March 4, 2009, he, the Defendant and Biggs burglarized two more homes. He could not recall in which order they burglarized the homes but described finding a home with no car in front. He said they ran around the back, knocked on the door, and, when no one answered, they entered the unlocked back door. Peden said that they found what they assumed to be gold jewelry in a black case, but later learned that it was "fake."

After learning the jewelry was not real, they threw it away because it was worthless. The other burglary was of Stewart's home. Peden recalled that he "stole a bunch of gold and went and pawned" it that same day. Peden said that they also stole laptop computers, jewelry, and numerous DVDs. On the following day, he took the stolen DVDs to the same pawn shop where he had taken the jewelry. Peden identified his signature on the bottom of a pawn ticket.

Brandy Biggs, a co-defendant in this case, testified that she lived in Nashville. At the time of the Defendant's trial, Biggs had already pled guilty for her role in these crimes and received an eight-year sentence to be served on community corrections. As a condition of

her plea agreement with the State, Biggs agreed to testify truthfully against her co-defendants. Biggs agreed that her criminal record consisted of shoplifting, assault, and simple possession misdemeanor convictions.

Biggs identified the Defendant in the courtroom and testified that she and the Defendant were involved in a romantic relationship for "about five years." Biggs said that, in March 2009, she, the Defendant, and Peden burglarized three homes in Sumner County. On March 2, they burglarized a trailer where they found a gun safe. Biggs said that the Defendant and Peden forced open the gunsafe and found shotguns and pistols, which they took from the trailer. Biggs recalled that while attempting to open the gunsafe, Peden cut his eye. Biggs said they took items from the trailer, including the guns, and went to her home and then to Nashville to try to sell the stolen items.

Biggs testified that, on the following day, she, the Defendant, and Biggs went to an Academy Sports store where the Defendant bought ammunition for one of the stolen guns. The State played the surveillance video footage for March 2, 2009, and Biggs identified herself, the Defendant, and Peden at the Academy Sports store in the footage.

Biggs testified that on March 4, 2009, she, the Defendant, and Biggs went to a brick house where they stole an Apple computer, a laptop computer, DVDs, and jewelry. Biggs could not recall if they stole laundry detergent from this particular home but testified that they did steal laundry detergent from one of the homes they burglarized. After leaving this house, they went to "the house in Kentucky, like what we did always," sorted through the stolen items, and then drove to a pawn shop in Nashville. The Apple laptop was sold but Biggs was uncertain to whom. She explained that the Defendant "was the one doing the dealings on the computer." Biggs recalled that they stole jewelry at the other home they burglarized that day and later pawned it.

Biggs testified that she leased the house in Kentucky, where she and the Defendant lived. Biggs said that she had a job with a temp service, but, after being fired, she worked at a Shoney's restaurant in Bowling Green, Kentucky. The Defendant would drive the victim to and from her work. Biggs said that she bought the Honda, which the police had subsequently searched, from one of the Defendant's acquaintances for $1000. Biggs gave the Defendant the money, and the Defendant purchased the car for her. She was unable to put her name on the title of the car because the Defendant kept the title with him. Biggs said that she drove the car "randomly," "maybe once or twice" to work.

Ben Brown, a Franklin City Police Department officer, testified that, on March 7, 2009, he was patrolling the area of Harristown, a high crime area, with a trainee. While on patrol, he observed a vehicle backing into a driveway with the headlights on. The police

officers believed the residence next door to that driveway was vacant. Officer Brown said that in this particular location there was a row of three houses that were "frequently vacant." After the vehicle pulled into the driveway, the driver turned the headlights off and stepped out of the vehicle. Officer Brown said that they were driving down the street toward the Defendant, and, when he turned and looked at the police car, the Defendant was "visibly startled." The Defendant then immediately turned around and walked quickly into the shadows and out of sight, behind the blue Honda and the row of houses.

Officer Brown testified that they drove around the block trying to locate the Defendant. Unable to find him, they returned to the location of the blue Honda. Officer Brown said that when he approached the driver side, where he initially saw the Defendant, he smelled the strong odor of marijuana. He noted that the windows of the car were "cracked" open. Officer Brown said they searched the area looking for the Defendant but again were unable to find him. They returned to the vehicle and checked the vehicle registration. The license tag on the vehicle, 705 TMB, returned as a 1994 blue Buick registered to the Defendant. Based upon this information, the officers began investigating the potential of a stolen vehicle. The officers located the VIN for the car which indicated the car was a 1994 red Honda registered under the name of Sean E. Bass.

On cross-examination, Officer Brown clarified that the VIN on the car had expired[1] and not the registration for the license plate as he had testified at the suppression hearing.

Carolyn Templeton, Chief Deputy for the Sumner County Clerk's office, identified an application for title submitted by William Osborne in September 2008. The license plate number was 705 TMB and the vehicle was a 1994 Buick. The expiration date for the vehicle tag was September 30, 2009.

Chris Tarlecky, a Sumner County Sheriff's office detective, testified that he located an Academy Sports store receipt inside the blue Honda. Detective Tarlecky also assisted in the execution of the search warrant for Biggs' residence in Kentucky. After Franklin police cleared the house for safety, Detective Tarlecky found four or five trash bags on the kitchen floor. Inside he found ammunition, jewelry, jewelry boxes, coins, and "regular household trash." At the Franklin Police Department, Detective Tarlecky matched several items to makes and models of items reported stolen in Sumner County. In total, Detective Tarlecky recovered four or five guns from Franklin, Kentucky, that were reported stolen in Sumner County.

---

[1] We find the testimony regarding an expired VIN puzzling, but ,as it is not determinative of the outcome of this case, we include it in order to be consistent with the record.

On cross-examination, Detective Tarlecky testified that he was present during the police interview of Biggs. He said that, initially, Biggs was not forthcoming and denied knowledge of the burglaries. After about fifteen or twenty minutes, Biggs began providing information about the burglaries.

Kevin Williams testified that at the time of these events he worked for the Portland Police Department. Officer Williams said that he and Biggs drove to the Shuler residence, and Biggs described the events of the burglary to him. Later, Officer Williams recovered some of the Shulers' property at the police department in Franklin, Kentucky.

Tim Bailey, a Sumner County police detective, testified that he investigated the burglary of Ms. Stewart's home. Upon arriving at Ms. Stewart's home he observed that the front door had been forced open. Police officers processed the scene and obtained fingerprints, which were sent for analysis. The fingerprints returned as matching Ms. Stewart's fingerprints.

In the course of his investigation, Detective Bailey met and spoke with Biggs. The interview began with Biggs minimizing her knowledge or role in the burglaries, but Biggs eventually told Detective Bailey about her involvement in the burglaries. After the interview, Biggs agreed to show police officers the houses she, the Defendant, and Peden burglarized. Detective Bailey also spoke with Peden. Peden also minimized his knowledge and role in the burglaries but ultimately confessed to the burglary of Ms. Stewart's home. Detective Bailey met with the Defendant, but the Defendant refused to give any statement to police about the burglaries.

Based upon this evidence, the jury convicted the Defendant of three counts of facilitation of aggravated burglary, one count of facilitation of theft of property between $500 and $1000, one count of theft of property between $500 and $1000, and one count of theft of property between $1000 and $10,000.

### C. Sentencing Hearing

At the sentencing hearing, Carolyn Megar testified that she prepared the Defendant's presentence report. In doing so, she met with the Defendant one time for approximately an hour and a half. The Defendant reported that, while in school, he was in special education because he did not read well and could not spell. He said that he suffered "extreme depression" and showed Megar scars where he had cut himself. The Defendant reported that he was raised by his grandmother after his mother abandoned him. The Defendant began working toward attaining his GED and enrolled in life management classes in the Kentucky prison.

Jeannie Richardson, the Defendant's aunt, testified that her sister had the Defendant when she was very young, so their mother raised the Defendant along with nine of her own children. Because the Defendant was only four years younger than Richardson, the two were very close growing up together. Richardson testified that, from "a young age," the Defendant suffered from depression and would hit his head or cut himself. She said the Defendant received some treatment for his mental illness but that he never received continuous treatment. Richardson recalled that, after the Defendant's release from prison in 2000, he had a construction job, "his own place," and two vehicles. After learning that his four-year old daughter was fathered by another man and losing his son at birth in 2008, the Defendant began drinking heavily.

Shaun Bass, a State of Tennessee facility supervisor, testified that he had known the Defendant five or six years. He hired the Defendant to do some work around his house. Bass said that the Defendant could do framing, drywall, finishing, and painting. He described the Defendant's workmanship as "superb" and "outstanding" and said the Defendant had a good work ethic. Bass recalled that, around the time that the Defendant lost his son, he noted a change in the Defendant. The Defendant would go to the baby's grave site almost every night and was "very depressed." The Defendant lived with Bass for a period of time and had access to Bass's personal things but never took anything. Bass said he found it "hard to believe" that the Defendant had committed these crimes and suggested that maybe the Defendant "got [ ] around the wrong group of people."

After the parties presented their proof as to sentencing, the trial court sentenced the Defendant as a career offender to an effective sentence of thirty-six years to be served at 60%. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant argues on appeal that: (1) the trial court erred when it denied the Defendant's motion to suppress; (2) the trial court erred when it allowed the jury to find the Defendant guilty on Count 1 after previously announcing the jury could not unanimously agree as to Count 1; (3) the trial court erred when it failed to declare a mistrial following prejudicial statements made by the State's witnesses; (4) the evidence at trial was insufficient to sustain his convictions; and (5) the trial court incorrectly imposed consecutive sentences.

### A. Motion to Suppress

The Defendant argues that the trial court erroneously denied his motion to suppress the evidence obtained as a result of the search of Biggs's car and residence. He asserts that police did not have the requisite probable cause to search Biggs's car. The Defendant further

argues that the items seized in the home should have been suppressed under the "fruit of the poisonous tree" doctrine. The State responds that the trial court properly denied the Defendant's motion because the Defendant failed to prove that he had standing to challenge the search of Biggs's car or home.

At the end of the suppression hearing, the trial court, in denying the Defendant's motion to suppress, made the following findings:

> I see no standing as to [the Defendant]. . . . The only testimony that we have showing that [the Defendant] - - the only mention was a picture that was found, a photograph of the defendant and Ms. Biggs in the house. There is absolutely nothing in this record to give standing to [the Defendant].

> I hold that [the Defendant] . . . [has] no standing in this case because [he has] not shown me any expectation of [privacy] in either the vehicle or the house searched.

The trial court then went on to find that police patrolling in a high-crime area after dark, the Defendant's response upon seeing the marked police car, the smell of marijuana emanating from the partially opened car window, and vehicle tags that did not match the vehicle were specific and articulable facts that provided probable cause and exigent circumstances for the search in this case.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23.

In order to object to the admission of illegally seized evidence, the defendant must establish a legitimate expectation of privacy in the place searched. *Rawlings v. Kentucky*, 448 U.S. 98 (1980); *State v. Harmon*, 775 S.W.2d 583 (Tenn. 1989); *State v. Roberge*, 642

S.W.2d 716 (Tenn. 1982); *State v. Crawford*, 783 S.W.2d 573 (Tenn. Crim. App. 1989); *State v. Burton*, 751 S.W.2d 440 (Tenn. Crim. App. 1988). The defendant bears the initial burden of proving by a preponderance of the evidence that the defendant has a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized and the identity of the items to suppress. *State v. Bell*, 832 S.W.2d 583, 589 (Tenn. Crim. App. 1991). Once these prerequisites have been established, the burden of proof shifts to the prosecution to establish by a preponderance of the evidence that the search and seizures were justified pursuant to one of the recognized exceptions to the warrant requirement. *State v. Burton*, 751 S.W.2d 440, 445-46 (Tenn. Crim. App. 1988).

On appeal, this Court considers the following factors when making a "legitimate expectation of privacy" inquiry:

(1) property ownership;
(2) whether the defendant has a possessory interest in the thing seized;
(3) whether the defendant has a possessory interest in the place searched;
(4) whether he has the right to exclude others from that place;
(5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion;
(6) whether he took normal precautions to maintain his privacy; and
(7) whether he was legitimately on the premises.

*State v. Turnbill*, 640 S.W.2d 40, 46 (Tenn. Crim. App. 1982).

In this case, the Defendant presented no evidence whatsoever as to his "standing" to contest the search and seizure of the car. The Defendant made a tactical decision not to present any information which would exhibit his association with Biggs. We do not question his tactical decision. We hold, however, that the trial court did not err in denying the Defendant's motion to suppress. The Defendant had no ownership interest in Biggs' car and, hence, no right to exclude others from the car. The Defendant did not exhibit normal precautions to maintain privacy in the vehicle by locking the car door. The Defendant is not entitled to relief on this issue.

## B. Hung Jury

The Defendant argues that the trial court did not "strictly comply" with Rule 31 (d)(2) of the Tennessee Rules of Criminal Procedure when the jury notified the trial court that it could not unanimously agree as to Count 1. Instead, the trial court instructed the jury to continue deliberations as to the remaining counts. Thereafter, the jury returned with its verdict, which included a guilty conviction for Count 1. The Defendant asserts that, as a

result, he should not have been found guilty on Count 1. The State responds that because the Defendant failed to raise a contemporaneous objection, he has waived this issue.

The record reveals that the jury was unclear as to the process to follow if they could not agree as to Count 1 in this case. The trial court addressed the jury, consistent with Tennessee Jury Pattern Instruction 41.08, directing the jury to continue considering the remainder of the charges against the Defendant. Neither the State nor the Defendant voiced any objection to this instruction, and the jury returned to its deliberation as to the remaining counts. Thereafter, the jury notified the trial court that it had reached verdicts and returned guilty verdicts as to Counts 1, 2, 4,5, 6, and 7.

The Defendant lodged no objection at the time of the trial court's instruction or in his motion for new trial. This marks his first objection to the jury's need for clarification as to the deliberation process and the trial court's response. Appellate relief is generally not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *see State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); *see also State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Accordingly, we conclude the Defendant waived our review of this issue, and he is not entitled to relief.

### C. Prejudicial Statements made by the State's Witnesses

The Defendant asserts that the trial court erred when it failed to grant a mistrial after the State's witness, Biggs, testified twice as to the Defendant's criminal charges in other jurisdictions. The Defendant acknowledges that the trial court instructed the jury to disregard Biggs' testimony, however, he maintains that this instruction "did not and could not" cure Biggs' prejudicial statements. The State responds that the trial court did not abuse its discretion by declining to *sua sponte* declare a mistrial in this case based upon two remarks made by Biggs.

During defense counsel's cross-examination of Biggs, the following exchange occurred:

| Defense Counsel: | Did you catch any burglary charges in Kentucky? |
| --- | --- |
| Biggs: | Well, of course, with [the Defendant], but not before - I mean - |
| Defense Counsel: | I'm going to object to that. |
| Trial Court: | Okay. Well, I'm going to sustain the objection. You will |

-13-

disregard any testimony that you heard.

Later, during the same cross-examination, defense counsel asked the following:

> Defense Counsel: In fact, you wanted this house to be solely in your name so you didn't have to depend on no man, right?
>
> Biggs: Well, that is correct, but the other reason why didn't nothing go in [the Defendant's] name is because he had warrants on him in Davidson County.
>
> Defense Counsel: Your Honor –
>
> Trial Court: Ladies and gentleman, disregard that answer. You're to strike it from your memory, and would you please step out of the courtroom and let me take up some things outside your presence.

The jury left the courtroom and the trial court explained to Biggs the limitations on her testimony. When the jury returned, the trial court gave the following instruction:

> Okay. Ladies and gentleman, we're back in court and back in session. I want to say two things to you. Number one, I have stricken that answer from the record and I have ordered you to disregard that testimony. Secondly, at times during the trial I have asked questions or I've kind of jumped in asking questions, as a referee, about the evidence, and I want you to understand by doing that I take no position on the facts in this case. I am performing my role as the trial judge, but I take no opinion as to the facts in this case when I take over or when I ask questions, and I want you to understand that.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim . App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id*. Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

-14-

In determining whether a mistrial is warranted because of inappropriate testimony of a witness, our Supreme Court has used the following three nonexclusive factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009) (citing *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994)).

We conclude the Defendant has not shown a clear abuse of discretion on the part of the trial court. Both of Biggs' comments were made in response to defense counsel's questions on cross-examination, one of which concerned Biggs' criminal charges and the other questioned her reasoning for the absence of the Defendant's name on the lease agreement for the Kentucky residence. Biggs testified that she had no criminal history other than those associated with the Defendant for the same conduct in Kentucky. She further testified that one of the reasons the lease agreement was not in the Defendant's name was because the Defendant had outstanding warrants. Biggs made these statements in direct response to questions posed by defense counsel. Although Biggs' statements were improper, defense counsel asked the questions on these issues, and the answers were foreseeable responses to the questions. Additionally, the trial court gave specific curative instructions to the jury, explaining that the jury must disregard the statement. We presume jurors follow the curative instructions of the trial court. *State v. Stout*, 46 S.W.3d 689, 715 (Tenn. 2001); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Finally, the State presented a strong case against the Defendant. The testimony does not, therefore, demonstrate a manifest necessity requiring a mistrial. The Defendant is not entitled to relief on this issue.

## D. Sufficiency of the Evidence

The Defendant contends that there is insufficient evidence to support his convictions. He argues that the only significant evidence against him came from two "criminals," Peden and Biggs. The State responds that any issues of credibility were determined by the jury and that there was sufficient corroborative evidence to support Biggs' and Peden's testimony.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence.

*Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn.2001). The law in Tennessee regarding accomplice testimony has been described as follows:

The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (citations omitted)). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

The jury convicted the Defendant of facilitation to commit aggravated burglary in Counts 1, 4, and 6. Tennessee defines burglary, in relevant part, as follows:

A person commits burglary who, without the effective consent of the property owner:

Enters a building other than a habitation (or any portion thereof) not open to the public, with the intent to commit a felony, theft or assault[.]

T.C.A. § 39-14-402(a)(1), (3) (2010). The offense of burglary is elevated to aggravated burglary when the building unlawfully entered is a "habitation." T.C.A. § 39-14-403 (2010).

The jury also convicted the Defendant of facilitation of theft of property between $500 and $1,000 in Count 1, theft of property between $500 and $1, 000 in Count 5, and theft of property between $1,000 and $10,000 in Count 7. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2010).

Pertinent to this appeal, a person facilitates a felony if "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403 (2010).

The evidence considered in the light most favorable to the State proves that the

Defendant, Biggs, and Peden entered Curry's trailer home without his consent to steal items of value, which were later sold for cash. Biggs and Peden testified that they, along with the Defendant, broke into Curry's trailer, pried open a gunsafe on Curry's bed, and stole guns and other valuable items, including a class ring. Curry's testimony, along with his roommate's testimony, corroborated Biggs' and Peden's testimony about the burglary. Curry testified that his trailer was "ransacked," and his gunsafe pushed onto his bed and pried open. His guns were taken from the gunsafe. Jones, Curry's roommate, testified that his class ring, among other items, was stolen during the burglary. Curry testified that the total value of the items stolen was "easily over $1,000."

Biggs and Peden testified that they, along with the Defendant, broke into Stewart's home without her consent and stole multiple items, including jewelry, laptop computers, and multiple DVDs. Biggs specifically testified about an Apple laptop computer. Biggs also testified that, although she could not remember which residence, they stole laundry detergent during one of the burglaries. Stewart's and Sircy's testimony corroborated Biggs' and Peden's testimony. Sircy, Stewart's uncle, testified that he observed a car in Stewart's driveway and saw three people walk around to the back of the house. Stewart testified that the front door to her house was "busted open" and the inside of her home was "ransacked." She said that an Apple laptop computer, jewelry, approximately eighty DVDs, and laundry detergent were stolen from her home during the burglary. She estimated the value of the stolen items was over $500.

Peden testified that he, along with Biggs and the Defendant, broke into the Shulers' home through the unlocked back door and stole jewelry. Shuler's testimony corroborated Peden's testimony. Shuler testified that the burglars entered through the back door of her home. She described the upstairs bedrooms as looking "like a hurricane had hit it." Shuler said that the jewelry from her bedroom was taken during the burglary. Shuler estimated the value of the stolen jewelry was approximately $3500.

Further, Peden testified that once the group identified a home, they ransacked the home in order to find valuables more quickly and leave the premises. All of the victims' descriptions of the state in which they found their homes after the burglary were consistent with Peden's testimony. Peden and Biggs also testified that they went to an Academy Sports store March 3, 2009, and the Defendant purchased ammunition for one of the guns stolen from Curry's trailer. Video surveillance footage from the Academy Sports store corroborated Peden's testimony

Based upon this evidence, we conclude that a rational jury could find the Defendant guilty beyond a reasonable doubt as to each of the Counts of facilitation of aggravated burglary, facilitation of theft of property between $500 and $1,000, theft of property between

$500 and $1, 000, and theft of property between $1,000 and $10,000.

We also address the Defendant's contention that both Biggs' and Peden's testimony is unreliable because they are "criminals." Tennessee courts have repeatedly held that questions concerning the credibility of witnesses are resolved by the trier of fact. *See Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859. The jury in this case heard the extent of Biggs' and Peden's criminal records, their roles in these crimes, and the agreements they reached with the State regarding the charges against them. Defense counsel cross-examined both Biggs and Peden on these matters. With this knowledge, the jury in this case, as demonstrated through their verdict, found Biggs and Peden credible. The Defendant is not entitled to relief on this issue.

### E. Sentencing

The Defendant' final argument attacks the trial court's imposition of consecutive sentencing in this case. The Defendant contends that the trial court improperly imposed consecutive sentencing in light of the Defendant's existing life sentence in federal prison. The State responds that, because the Defendant has an extensive criminal history, the trial court properly imposed consecutive sentencing. We agree with the State.

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the following seven factors exists:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

-19-

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b)(1)-(7) (2010). These criteria are stated in the alternative; therefore, only one need exist in order to impose consecutive sentencing.

In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In the present case, the trial court made a finding that the State had produced sufficient evidence that "the defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2) (2010). The trial court, as to this factor, stated the following:

> I find that [the Defendant] is an offender whose record of criminal activity is extensive. According to the pre-sentence report we've got about 17 felonies, 8 misdemeanors; we've got arrest and convictions in West Virginia, Florida, Indiana, Kentucky, and Tennessee. And in Tennessee we have Sumner County, Davidson county, and Robertson County. Record is absolutely incredibly extensive. This is one of the most extensive records that I have seen in any case.

The trial court then ordered Counts one and two to run concurrently, Counts four and five to run concurrently, and Counts six and seven to run concurrently, but consecutively to one another for an effective sentence of thirty-six years in the Tennessee Department of Correction.

Our review of the record reveals that the Defendant has engaged in criminal activity over the course of the last twenty years. He committed approximately half the crimes for

which he was convicted before a lengthy period of incarceration, and then, upon release, he committed additional crimes for which he was convicted. At least fourteen of his convictions are for aggravated burglary, which he began committing as early as 1990.

Based upon this evidence, the trial court did not err in ordering the partial consecutive sentence. There was ample evidence in the record supporting the factor relied upon by the trial court to order consecutive sentencing in this case. *See State v. Adams*, 973 S.W.2d 224 (Tenn. Crim. App. 1997) ("Extensive criminal history alone will support consecutive sentencing."). Thus, the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE