IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
February 3, 2015 Session
Heard at University of Memphis Cecil C. Humphreys School of Law[1]

**STATE OF TENNESSEE v. JAMES ROBERT CHRISTENSEN, JR.**

**Appeal from the Circuit Court for Tipton County**
**No. 7799     Joseph H. Walker III, Judge**

**No. W2014-00931-CCA-R3-CD  -  Filed May 14, 2015**

Appellant, James Robert Christensen, Jr., stands convicted of resisting arrest, a Class B misdemeanor; promotion of methamphetamine manufacture, a Class D felony; initiation of methamphetamine manufacture, a Class B felony; and two counts of possession of a firearm during the commission of a dangerous felony, Class D felonies.  He received an effective sentence of three years' incarceration followed by eight years suspended to supervised probation.  On appeal, appellant contends that the trial court erred by denying his motion to suppress evidence and that the evidence was insufficient to sustain his convictions for two counts of possession of a firearm during the commission of a dangerous felony. Following our careful review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court.  JOHN EVERETT WILLIAMS, J., filed a concurring and dissenting opinion.  CAMILLE R. MCMULLEN, J., concurred in results only.

Charles A. Brasfield (at trial and on appeal) and Amber Griffin Shaw (at trial), Covington, Tennessee, for the appellant, James Robert Christensen, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]  This case was heard on the campus of the University of Memphis Cecil C. Humphreys School of Law as a special project of the Tennessee Court of Criminal Appeals in furtherance of the educational process of students and faculty.

**OPINION**

**I. Facts**

On August 3, 2013, investigators with the Tipton County Sheriff's Office discovered an active methamphetamine lab, multiple firearms, materials used in the manufacture of methamphetamine, and several inactive methamphetamine labs in appellant's residence. As a result of these findings and appellant's conduct when officers attempted to detain him, appellant was indicted for resisting arrest, promotion of methamphetamine manufacture, initiation of methamphetamine manufacture, and two counts of possession of a firearm during the commission of a dangerous felony.

**A. Motion to Suppress**

Prior to trial, appellant moved to suppress the evidence against him, arguing that because appellant had posted "no trespassing" signs on his property, the officers' actions in entering his property were subject to the warrant requirement.

At the suppression hearing, Investigator Michael Green testified that the sheriff's office had received information that Mariah Davis had purchased pseudoephedrine. Investigators were aware that she was associated with Cody Gatlin, whom Investigator Green knew through his law enforcement experience. Investigator Green and Investigator Brent Chunn went to Mr. Gatlin's home, which was next door to appellant's residence. They spoke first to Ms. Davis, who called Mr. Gatlin to come home. Mr. Gatlin reported to the investigators that he had taken the pseudoephedrine to appellant and that appellant was in the process of making methamphetamine. The investigators then went to appellant's residence. Investigator Green recalled that the grass around appellant's driveway was very tall, that a "no spraying" sign was posted near the road, and that the driveway was sixty to seventy yards long. There were two trailers at the end of the driveway. The investigators parked in the driveway and proceeded directly to the front door of appellant's trailer. Investigator Green testified that he smelled the odor commonly associated with the active manufacturing of methamphetamine as he approached the residence. Appellant exited the front door and closed it behind him. The investigators asked for appellant's consent to search his residence, but appellant refused. Investigator Green testified that methamphetamine labs were "very volatile" and could "catch fire real quick," so he and Investigator Chunn decided that they needed to locate the active lab for safety reasons. Investigator Chunn entered appellant's residence while Investigator Green attempted to detain appellant. He placed a handcuff on appellant's right wrist, but thereafter appellant began to fight him. Appellant yelled for "Bear," later determined to be a dog, to come and for his mother, who lived in an adjacent trailer, to call 1-800-THE-FIRM.[2] When Investigator Chunn returned, the investigators were able

---

[2] We have determined that 1-800-THE-FIRM is the number for the Cochran Firm, established by the late Johnnie Cochran.

to handcuff appellant. Investigator Green testified that he then entered the residence and saw a "bolt action 410 pistol right at the door, [and] a 410 shotgun and a rifle on the couch." Investigator Chunn located the active lab, and they found "remnants of . . . older cooks, several cans of empty Coleman fuel, and then [they] located the ten separate one-pot labs in the freezer." The investigators took turns letting pressure off the active lab to make it safe. Investigator Green testified that the fire department decontaminated appellant and transported him to the hospital because "his heart rate or blood pressure was really, really elevated."

On cross-examination, Investigator Green testified that Ms. Davis told them that she had purchased the pseudoephedrine for appellant. Investigator Green said that after speaking with Ms. Davis and Mr. Gatlin, he did not believe that he had probable cause to obtain a search warrant nor exigent circumstances to search appellant's residence without a search warrant. He felt that he had exigent circumstances to enter appellant's residence after appellant exited his residence. Investigator Green testified that he did not see the "no trespassing" sign posted by appellant's driveway, but he recalled seeing a handwritten sign stating, "organic farm, do not spray," or words to that effect. He stated that he did not see any "private property" signs or other similar signage. He said that he asked for consent to search appellant's residence despite believing that he had exigent circumstances because he wanted to develop a rapport with appellant. He recalled appellant's telling the investigators to leave his property but stated that he had already smelled the methamphetamine at that point. Investigator Green further recalled appellant's saying that he had an injury that would prevent his being handcuffed but because "[h]e showed [Investigator Green] shortly thereafter that those injuries didn't apply to fighting," Investigator Green believed that "handcuffs would have been okay." Investigator Green testified that appellant told the investigators where to find the active lab after he had been handcuffed.

On re-direct examination, Investigator Green testified that when a methamphetamine lab catches fire, it is "just like a flame thrower." He further testified, "I've seen one that actually was in a trailer like this, that it actually blew the walls away from the flooring, and the guy that was in there had a tattoo up here [by his shoulder], and it was down here [by his wrist]. It just melted, just ran down his skin."

Investigator Brent Chunn testified that he did not believe that Cody Gatlin's information (that he had taken the pseudoephedrine to appellant and that appellant was in the process of making methamphetamine) was enough for probable cause to search appellant's residence or to obtain a search warrant. He characterized their approach of appellant as a "follow up investigation" rather than a "knock and talk" because they would have been more cautious if they had been conducting a "knock and talk." Investigator Chunn did not recall seeing any "no trespassing" signs on appellant's property or any other signs. Investigator Chunn testified that he first smelled

methamphetamine when he was approximately fifteen feet away from appellant.  He recalled that appellant first asked them whether he could help them.  After appellant would not consent to a search of his residence, Investigator Chunn "[f]orced the door open."  He went through the residence to make sure no one else was inside.  He testified that he saw a pistol "right inside the door."  When he exited, he saw Investigator Green and appellant "wrestling on the ground."  Investigator Chunn testified that he later found the active methamphetamine lab in the freezer of appellant's refrigerator.  Investigator Green found the inactive labs in a separate deep freezer.  Investigator Chunn commented that placing labs in freezers was not a common practice.

Tammy Atkins testified that she knew appellant through her church.  She said that on July 13, 2013, she was visiting people on appellant's road for her church and noticed "no trespassing" signs on his property.  She testified that there were several "no trespassing" or "private property" signs and identified three such signs in a photograph of appellant's property.  Ms. Atkins said, "[W]e're not supposed to go to houses that have 'no trespassing' signs."  She testified that she had been on appellant's road several times since July 13 and always saw the "no trespassing" signs.

The trial court took the matter under advisement and later issued an order denying appellant's motion to suppress.  In its order, the trial court stated that the investigators "had reasonable suspicion of illegal activity based on substantiated facts" and that the "no trespassing" sign "was not a bar from the officers['] investigating an ongoing dangerous highly combustible activity."  The trial court further stated that the investigators had "reasonable grounds" to search appellant's residence after smelling methamphetamine because "[t]hey knew that the lab must be bled or it might burst into flames or explode."

## B.  Trial

At trial, Investigator Green testified consistently with his testimony at the suppression hearing.  In addition, he testified that appellant's trailer was forty to fifty feet from Cody Gatlin's residence, "as the crow flies."  Investigator Green also listed all of the items seized from appellant's residence: one pound of non-liquid drain opener; thirty-two ounces of liquid drain opener; four empty Coleman fuel cans; two jars of Coleman fuel; nine inactive labs; eight empty HCL generators; a bag of Epsom salts; an empty box of Sudafed; and "miscellaneous lab trash."  All of these items were destroyed because they were contaminated with methamphetamine.  Investigator Green said that he collected from just inside the front door a loaded, sawed-off 410 shotgun[3] with a homemade magazine made from duct tape.  He also collected a loaded 410 shotgun with a laser sight and an unloaded .22 rifle from the residence's couch.

---

[3]  Apparently this weapon was short enough that the trial participants also referred to it as a handgun.

-4-

On cross-examination, Investigator Green testified that he first learned about methamphetamine possibly being manufactured on August 3 from his lieutenant, whose source was Kyle Wolfe. The specific information was that Mariah Davis would be purchasing pseudoephedrine for the purpose of manufacturing methamphetamine. Investigator Green said that when he talked to Cody Gatlin, Mr. Gatlin had just come from appellant's house. He stated that he saw Mr. Gatlin in appellant's yard and assumed that he had come from inside the house. Mr. Gatlin told the investigators that there "was an active cook going on." He agreed that it would have been possible for Mr. Gatlin to have been the person actually manufacturing.

Investigator Chunn testified next. He narrated the video from a patrol car driven by Corporal Jeff Thompson that was recorded when Corporal Thompson responded to appellant's address on August 3. Investigator Chunn said that he did not see a "standard 'no trespassing' sign[]" in the video. The remainder of Investigator Chunn's testimony was consistent with his suppression hearing testimony and Investigator Green's testimony. Notably for purposes of this case, he affirmed that he saw the three guns previously mentioned when he was conducting his first sweep of appellant's residence.

On cross-examination, Investigator Chunn identified a still-shot photograph taken from the patrol car video. He confirmed that the photograph depicted signs on a post but that the photograph was too blurry to read the signs.

The State rested its case after Investigator Chunn's testimony. For the defense, Kyle Wolfe testified that he had been to appellant's house once. He recalled watching appellant and Cody Gatlin shooting guns in the yard. The three men also smoked marijuana that day. Mr. Wolfe testified that he told law enforcement that Mr. Gatlin was going to "cook" methamphetamine on August 3. He knew this information because Mr. Gatlin had asked him to purchase a box of pseudoephedrine. He refused to do so.

Cody Gatlin testified that appellant was his father's next-door neighbor. Mr. Gatlin said that he did not know anything about the guns in appellant's house but recalled hearing appellant shooting on his property. Mr. Gatlin recalled that on August 3, he took "sinus medication" to appellant and that appellant had asked Ms. Davis to purchase the medication for him. He said that appellant promised to give Ms. Davis money and drugs for the medication. Mr. Gatlin testified that he did not see any money exchange, however. He also testified that he had been on his way back from appellant's house when Ms. Davis called him about the investigators being at his father's house. Mr. Gatlin said that he was not going to help anyone manufacture methamphetamine and that he did not know how methamphetamine was manufactured.

Appellant testified that he had four or five "no trespassing" signs on his property and identified a photograph of the one that was at the beginning of his driveway, which

read, "no trespassing[,] hunting[,] or fishing." Appellant said that he started using methamphetamine when he suffered depression due to an unfortunate medical diagnosis. He stopped using drugs for a time period but resumed using drugs when he allowed Cody Gatlin to begin manufacturing methamphetamine in his house. He said that Mr. Gatlin purchased all the supplies for manufacturing and explained that he only left his home a few times a year because he did not have a driver's license or a car. Appellant said that his agreement with Mr. Gatlin was that Mr. Gatlin would give him half of the drugs made in exchange for the use of his house. Appellant testified that on August 2, 2013, he practiced target shooting in his backyard. He would normally have cleaned his guns after practicing but did not do so that day. On August 3, he was about to clean his guns when Mr. Gatlin came over and began making methamphetamine. Mr. Gatlin received a telephone call from Ms. Davis about the police being at his father's house, so Mr. Gatlin placed the methamphetamine lab in the freezer and left. Appellant testified that he shut and locked his front door (for which he did not have a key), exited his back door, and walked to his front porch to await the officers. He said that he was not armed at that time and did not have access to his guns. Appellant testified that when the officers approached him, he told them, "Could I help you? I don't know if you've noticed this or not, but you passed 'no trespassing' signs to get here. If you don't have a search warrant, you need to leave my property. What you're doing is unconstitutional." Appellant said that Investigator Green told him that he was going to detain him. Appellant responded that because of previous injuries, they would have to break his arm to handcuff him. He said that Investigator Chunn stated, "'Oh, we're breaking your arm.'" When Investigator Green did not contradict Investigator Chunn, appellant said that he pulled his arm back and told them to leave his property. Instead, he said that "[t]hey started punching [him] and kicking [him] and choking [him]."

On cross-examination, appellant testified that the loaded handgun on the floor by the front door was there because he had been interrupted before he could clean it. He said that he set it on top of his television when he went to answer the door and that it must have fallen when the door was kicked in. Appellant said that during the struggle with the police, his elbow and shoulder were dislocated but that he did not receive medical treatment for the dislocation. Rather, the joints "come back in place [sic]" approximately a week later.

After the close of proof and deliberations, the jury convicted appellant as charged. The trial court held a sentencing hearing and imposed an effective sentence of three years' incarceration followed by eight years suspended to supervised probation. Appellant's motion for new trial was subsequently heard and denied, and he now appeals the judgments of the trial court.

## II. Analysis

### A. Motion to Suppress

Appellant argues that the trial court erred by denying his motion to suppress, in which he contended that the evidence seized should be suppressed due to an illegal search of his residence. On appeal, he maintains that the "no trespassing" signs on his property meant that the investigators could not legally enter his property to conduct a "knock and talk" investigation. Instead, appellant asserts that the investigators either needed a warrant or exigent circumstances to approach his residence, and he further asserts that there was no exigency until the investigators were already at appellant's front door. Appellant also contends that any exigency had expired after the initial sweep of appellant's residence and that consequently the investigators should have obtained a warrant before re-entering the residence.

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

At a hearing on a motion to suppress evidence recovered as a result of a warrantless search, the State must prove that the search was reasonable. *State v. Coulter*, 67 S.W.3d 3, 41 (Tenn. Crim. App. 2001). To carry its burden, the State must prove that law enforcement conducted the warrantless search or seizure pursuant to one of the narrowly-defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Our supreme court has held:

> [U]nder both the federal constitution and our state constitution, a search without a warrant is presumptively unreasonable, and any evidence obtained pursuant to such a search is subject to suppression unless the [S]tate demonstrates that the search was conducted under one of the

> narrowly defined exceptions to the warrant requirement. Moreover, Tennessee has approved of and adopted exceptions to the requirement of obtaining a valid search warrant, including search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and others.

*State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted); *see State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012). Pursuant to the exigent circumstances exception, a warrantless search may be conducted where there are exigent circumstances and probable cause. *Fuqua v. Armour*, 543 S.W.2d 64, 68 (Tenn. 1976); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005). "Exigent circumstances are limited to three situations: (1) when officers are in 'hot pursuit' of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." *Adams*, 238 S.W.3d at 321 (quoting *State v. Steven Lloyd Givens*, No. M2001-00021-CCA-R3-CD, 2001 WL 1517033 (Tenn. Crim. App. Nov. 29, 2001)) (internal quotation marks omitted). "Given the importance of the warrant requirement in safeguarding against unreasonable searches and seizures, a circumstance will be sufficiently exigent only where the State has shown that the search is imperative." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008) (citations omitted). "No amount of probable cause can justify a warrantless search or seizure, absent 'exigent circumstances.'" *Fuqua*, 543 S.W.2d at 68 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 468 (1971)) (internal quotation marks omitted).

However, "[i]t is well settled that the Fourth Amendment's procedural safeguards do not apply to police investigative activities unless those activities constitute a 'search' within the meaning of the Fourth Amendment." *State v. Bell*, 832 S.W.2d 583, 589 (Tenn. Crim. App. 1991). "In consequence, 'an investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion or a search warrant.'" *State v. Talley*, 307 S.W.3d 723, 730 (Tenn. 2010) (quoting *Bell*, 832 S.W.2d at 589-90). Under both the federal and state constitutions,[4] we must inquire "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001). A government intrusion without a warrant or without an applicable exception to the warrant requirement is illegal when an individual has a justifiable expectation of privacy. *See Bell*, 832

---

[4] We note that our state supreme court has held that Article 1, section 7 of the state constitution "'is identical in intent and purpose with the Fourth Amendment'" but that under the state constitution, the state supreme court may extend greater privacy protections than the federal constitution when necessary. *State v. Randolph*, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)).

S.W.2d at 589; *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.). The United States Supreme Court has also presented an alternative definition of a search as an "unlicensed physical intrusion" into a constitutionally protected area. *Florida v. Jardines*, --- U.S. ---, ---, 133 S. Ct. 1409, 1415, 185 L. Ed. 2d 495 (2013). For purposes of our opinion, we will apply both the reasonable expectation of privacy test and the *Jardines* test for a search in our analysis.

In this case, there are three separate government actions to consider when determining whether the evidence seized as a result of the warrantless search of appellant's residence should have been suppressed. First, the investigators entered appellant's property to conduct a "follow-up investigation" despite appellant's "no trespassing" signs, which the officers did not see. Second, after smelling methamphetamine, Investigator Chunn forced entry into appellant's residence and conducted a brief sweep, during which he saw the firearms and some of the components for making methamphetamine but did not see the active or inactive labs. Third, after appellant told the officers that the lab was in the freezer, the investigators re-entered appellant's residence and collected the active lab from the refrigerator freezer and the inactive labs from the deep freezer. Investigators also collected the firearms and manufacturing components.

Thus, we must first inquire whether the investigators were legally on appellant's property when they drove down appellant's driveway and approached his front door to contact him about the information they received from Mr. Gatlin and Ms. Davis. "As with all Fourth Amendment questions, the touchstone of the analysis is reasonableness." *State v. Moats*, 403 S.W.3d 170, 194 (Tenn. 2013). Our courts have recognized the validity of the so-called "knock and talk" police procedure, whereby police officers approach a residence for purposes of furthering an investigation by asking questions of the inhabitants or asking for consent to search the residence. *State v. Cothran*, 115 S.W.3d 513, 521-23 (Tenn. Crim. App. 2003). The reasoning behind the validity of the "knock and talk" procedure is that any private citizen, by a "license . . . implied from the habits of the country," may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 133 S. Ct. at 1415. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 1416 (quoting *Kentucky v. King*, 563 U.S. ---, ---, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)). In addition, our supreme court has reasoned that "[a] person does not have an expectation of privacy in the area in front of his or her residence leading from the public way to the front door." *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005).

Appellant contends that unreported cases from this court have held that a "no trespassing" sign invalidated the "knock and talk" procedure by revoking the implied

invitation of the front door. *See State v. Monty Blackwell*, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn. Crim. App. Feb. 10, 2010) (stating in dicta that "no trespassing" signs revoked the implied invitation of the front door); *see also State v. Rebecca Draper and J.C. Draper*, No. E2011-01047-CCA-R3-CD, 2012 WL 1895869, at *6 (Tenn. Crim. App. May 24, 2012) (quoting *Monty Blackwell*, 2010 WL 454864, at *7), *State v. Scotty Wayne Henry*, No. W2005-02890-CCA-R3-CD, 2007 WL 1094146, at *5 (Tenn. Crim. App. Apr. 11, 2007) (stating in dicta, "The only issue presented that would have made the 'knock and talk' unacceptable would have been the presence of the 'No Trespassing' signs."). It is upon these cases that appellant relies, essentially arguing that these cases present a bright-line rule that this court should follow. However, unreported cases are persuasive authority, not controlling. *See* Tenn. R. Sup. Ct. 4G. Furthermore, our supreme court has eschewed the creation of bright-line rules for purposes of Fourth Amendment analysis. *See Talley*, 307 S.W.3d at 734 ("[W]e reject any bright-line rule and maintain our view that the totality of the circumstances test is best-suited for determining the reasonableness of an expectation of privacy."). Likewise, the United States Supreme Court has stated that "[i]n applying this [reasonableness] test, the Court has consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette*, 519 U.S. 33, 34 (1996). In addition, the cases relied upon by appellant are distinguishable from the case sub judice; therefore, we conclude that no bright-line rule has been established by this court. Thus, we will examine the totality of the circumstances in this case to determine whether appellant revoked the implied invitation of the front door.

We must determine for this case what effect, if any, the "no trespassing" sign had on appellant's expectation of privacy and the validity of the law enforcement action in this case. In so doing, we have reviewed numerous cases from this and other jurisdictions. Our court, in the case that first recognized the validity of the "knock and talk" procedure, quoted a Ninth Circuit case that stated a "knock and talk" was acceptable "[a]bsent express orders from the person in possession against any possible trespass . . . ." *Cothran*, 115 S.W.3d at 521 (quoting *United State v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000)). The Ninth Circuit has repeatedly held that "no trespassing" signs alone did not invalidate "knock and talk" procedures. *See United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) (holding that "no trespassing" signs posted at entry of driveway did not invalidate "knock and talk" when officers approached home from helicopter's landing site and did not see the signs); *United States v. Robert*, 747 F.2d 537, 541-43 (9th Cir. 1984) (holding that it was acceptable for troopers to approach house after having accessed house by means of a private road posted with "no trespassing" signs). Thus, for the Ninth Circuit, "no trespassing" signs alone do not rise to the level of "express orders . . . against any possible trespass."

Notably, the federal district court in the Eastern District of Tennessee recently ruled that a "no trespassing" sign did not prevent officers from conducting a "knock and

talk." *United States v. Denim*, No. 2:13-CR-63, 2013 WL 4591469, at *4 (E.D. Tenn. Aug. 28, 2013). The *Denim* court reasoned as follows:

> As sacred as the home is, including its curtilage, society is not willing to accept as reasonable an expectation that a police officer may not come within the curtilage to question a resident of a dwelling to ascertain if that resident has information regarding the commission of a criminal offense. Even in the face of No Trespassing signs, it is not unreasonable for a police officer to intrude upon private property to ask if the resident has any information that will aid in the investigation of a crime.

*Id.* The Sixth Circuit has also held that a "no trespassing" sign was of no consequence when the police were conducting a "knock and talk." *See United States v. Hopper*, 58 F. App'x 619, 623 (6th Cir. 2003). The Sixth Circuit reasoned that "no trespassing" signs did not extend the curtilage of the defendant's residence and that even if the signs had extended the curtilage, "the actions of the police in this case would not have violated the Fourth Amendment because law enforcement officials may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *Id.* We find the reasoning in these cases to be persuasive. *See Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968) (holding that federal search and seizure cases should be considered persuasive authority in Tennessee).

We have also examined cases from other federal circuits and states. Some states have held that "no trespassing" signs demonstrate a legitimate expectation of privacy that requires a warrant to overcome. *See State v. Roubique*, 421 So. 2d 859, 862 (La. 1982); *State v. Bullock*, 901 P.2d 61, 75-76 (Mont. 1995); *People v. Scott*, 593 N.E.2d 1328, 1338 (N.Y. 1992). The vast majority of states that have directly addressed the issue, however, consider signage to be but one consideration when determining whether a person has demonstrated a legitimate expectation of privacy. *See, e.g., Michel v. State*, 961 P.2d 436, 437-38 (Alaska Ct. App. 1998) (holding that "[p]ersons visiting the residence for social or commercial purposes" would not construe "no trespassing" signs along driveway "as meant to prohibit their entry"); *Burdyshaw v. State*, 10 S.W.3d 918, 921 (Ark. Ct. App. 2000) ("[E]ven though the property was posted, the gates were open, the driveway was not blocked, and entry onto the property was not an intrusion prohibited by the Fourth Amendment."); *Burkholder v. Superior Court*, 96 Cal. App. 3d 421, 428 (Cal. Ct. App. 1979) (holding that expectation of privacy was objectively reasonable when "[e]ntry to the property was openly restricted by posted signs along, and locked gates across[] the rural access road signif[ied] an intention to deny access to the public in general, including government agents"); *Brown v. State*, 152 So.3d 619, 624 (Fla. Dist. Ct. App. 2014) ("While this Court has found that a policeman may enter the curtilage surrounding a home in the same way as a salesman or visitor could, no such person would reasonably go through both a gated four-foot fence and a gated six-foot

fence, surrounded by several 'No Trespassing' signs in order to conduct business with the residents."); *Wysong v. State*, 614 So.2d 670, 671 (Fla. Dist. Ct. App. 1993) (holding that officers did not illegally enter yard to knock on door despite "no trespassing" sign); *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho Ct. App. 1992) ("Posting 'No Trespassing' signs may indicate a desire to restrict unwanted visitors . . . . However, such signs cannot reasonably be interpreted to exclude normal, legitimate, inquiries or visits by mail carriers, newspaper deliverers, census takers, [etc.] who restrict their movements to the areas of one's property normally used to approach the home." (citations omitted)); *Mundy v. State*, 21 N.E.3d 114, 118-19 (Ind. Ct. App. 2014) (holding that it was unreasonable for officers to enter property when it was posted, there was a chain across the driveway, and a security camera was on a tree near the chain); *State v. Fisher*, 154 P.3d 455, 470-75 (Kan. 2007) (ruling that deputy was legally on property to conduct "knock and talk" but could not seize evidence from curtilage; presence of "no trespassing" signs was part of curtilage analysis); *Jones v. State*, 943 A.2d 1, 12 (Md. 2008) ("For Fourth Amendment purposes, appellant could not have had a reasonable expectation that the 'No Trespassing' sign would or should prevent visitors with a legitimate purpose from walking to the front door, including police officers in furtherance of an investigation."); *State v. Kruse*, 306 S.W.3d 603, 611-12 (Mo. Ct. App. 2010) (stating that signage is one consideration when determining whether police intrusion into backyard was reasonable); *State v. Pasour*, 741 S.E.2d 323, 326 (N.C. Ct. App. 2012) ("[W]hile not dispositive, a homeowner's intent to keep others out and thus evidence of his or her expectation of privacy in an area may be demonstrated by the presence of 'no trespassing' signs."); *State v. Mittleider*, 809 N.W.2d 303, 307-08 (N.D. 2011) (holding that "no trespassing" signs on farm did not create reasonable expectation of privacy in entrance to the farm but leaving open the question of whether such signs could ever create a reasonable expectation of privacy); *State v. Morgan*, No. 13-CA-30, 2014 WL 1836015, at *3-4 (Ohio Ct. App. May 1, 2014) (holding that initial "knock and talk" was "unobjectionable"—despite "no trespassing" signs in front of house but entry into backyard was unreasonable, partly because of the signage), *no perm. app. filed*; *State v. Roper*, 294 P.3d 517, 520 (Or. Ct. App. 2012) (holding that fence plus signage "objectively manifested intent to exclude the public"); *State v. Gabbard*, 877 P.2d 1217, 1221 (Or. Ct. App. 1994) (concluding that "no trespassing" sign on boundary fence, without more, would not have served to exclude the "reasonable visitor . . . who desired to contact the residents" and that, therefore, officers could rightfully use driveway to approach house); *Robinson v. Commonwealth*, 639 S.E.2d 217, 222 (Va. 2007) ("Implied consent can be negated by obvious indicia of restricted access, such as posted 'no trespassing' signs, gates, or other means that deny access to uninvited persons."); *State v. Johnson*, 879 P.2d 984, 992 (Wash. Ct. App. 1994) (holding that the defendants manifested "their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying 'No Trespassing' and 'Private Property.'").

In addition, we note that the United States Supreme Court in *Oliver v. United*

*States*, when determining whether "no trespassing" signs created a legitimate expectation of privacy in open fields when there would otherwise be no expectation of privacy stated, "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs." *Oliver*, 466 U.S. at 183 n.13. Even under the *Jardines* search test, which focuses more on trespass law than on expectation of privacy, the officers' actions in merely conducting a "knock and talk" would not be proscribed as a warrantless search. *See Jardines*, 1415-18 (ruling that bringing a drug-sniffing canine into defendant's curtilage objectively demonstrated that the police were intruding upon a constitutionally protected area to search, not merely conducting a "knock and talk"). "The law of trespass generally gives members of the public a license to use a walkway to approach the front door of a house and to remain there for a brief time." *Id.* at 1420 (Alito, J., dissenting). Consequently, if the officers' actions were not a search, then the Fourth Amendment protections would not apply.

Taking all of these cases into consideration, the emerging rule appears to be that the implied invitation of the front door can be revoked but that the revocation must be obvious to the casual visitor who wishes only to contact the residents of a property. *See State v. Grice*, 767 S.E.2d 312, 319 (N.C. 2015) ("The implicit license enjoyed by law enforcement and citizens alike to approach the front doors of homes may be limited or rescinded by clear demonstrations by the homeowners and is already limited by our social customs."). Thus, in this case, we must determine whether a small sign reading "no trespassing[,] hunting[,] or fishing," posted in a field next to appellant's driveway that is difficult to see when driving down the driveway, as evidenced by the "dashcam" video presented in this case, is sufficient to revoke the implied invitation.[5] Several courts when ruling on this issue have noted that such a sign, especially on a rural property, is generally intended to prevent people from unauthorized use of the property, not to prevent a casual visitor from approaching the residence. *See, e.g., U.S. v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982); *Michel*, 961 P.2d at 438. The *Ventling* court quoted with approval the magistrate's opinion in that case:

> The absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way. The presence of "no trespassing" signs in this country without a locked or closed gate make the entry along the driveway for the purposes above described not a trespass and therefore does not constitute an intrusion prohibited by the Fourth Amendment.

---

[5] We note that Ms. Atkins testified that there were other signs on the property, but because the "dashcam" video does not show those signs, we conclude that they are not visible to someone approaching the house using the driveway, as the officers did in this case.

*Ventling*, 678 F.2d at 66. The *Michel* court likewise reasoned that the "no trespassing" signs were not intended to forestall casual visitors from using the driveway to reach the residence:

> The Michels live in rural Alaska, and their residence lies some distance off the main highway, connected by a long driveway. Under these circumstances, a visitor to the Michels' residence would reasonably conclude that the "No Trespassing" signs posted along the driveway were intended to deter people who might be tempted to leave the highway and use the Michels' driveway as an access route for their own purposes (e.g., hunting, camping, hiking, or the like). Persons visiting the residence for social or commercial purposes would not construe those signs as meant to prohibit their entry.

*Michel*, 961 P.2d at 438. Likewise, we conclude that the sign in this case would not have prevented the casual visitor or the reasonably respectful citizen from approaching appellant's residence. Therefore, the sign did not revoke the implied invitation of the front door, and Investigators Green and Chunn lawfully entered appellant's property when they drove up his driveway and approached his front door. Such conduct was not a search under Fourth Amendment jurisprudence.

However, the warrantless entry into appellant's home for the purpose of discovering active methamphetamine labs was unquestionably a search; therefore, we must consider whether exigent circumstances justified the warrantless entry into appellant's residence. The investigators testified that they smelled the methamphetamine as they approached the residence. There is no question that an active methamphetamine lab was present in appellant's residence. The investigators stated that an active lab has a distinctive odor apart from the general odor of methamphetamine. They also testified about the dangers of unattended active labs. Investigator Green in particular gave a graphic description of the aftermath of a methamphetamine explosion. Our supreme court has held that exigent circumstances existed to justify law enforcement's warrantless entry into a hotel room when an active methamphetamine lab was present:

> The undisputed facts clearly establish the sort of exigent circumstances that justified the officers' decision to enter Room 110 of the Park Motel without first obtaining a search warrant. They knew that an actively operating methamphetamine laboratory posed a serious danger not only to the persons in the room itself but also to all persons in the immediate vicinity. The distinct odor surrounding Room 110, the intensity and strength of the odor, the fumes emanating from Room 110, and the effects of the odor and fumes on the inhabitants of Room 109 provided the officers with enough facts to

believe that the persons in Room 110 were actively manufacturing methamphetamine. This conclusion provided the officers with an objectively reasonable basis for concluding that there was an immediate need to act to protect themselves and others from serious harm. The fact that the officers overlooked clearing the adjoining rooms before they entered Room 110 does not undermine the reasonableness of their decision to enter Room 110 without waiting for a search warrant. Accordingly, the officers' warrantless entry into and search of Room 110 was not an unreasonable search under either the Fourth Amendment to the United States Constitution or Article I, Section 7 of the Constitution of Tennessee.

*State v. Meeks*, 262 S.W.3d 710, 726-27 (Tenn. 2008) (footnote omitted). While appellant's residence was in a more rural area, there was a trailer immediately adjacent to his own, and neighbors were located within fifty feet. Moreover, appellant himself and the investigators were in immediate danger had the active lab exploded. Therefore, we conclude that exigent circumstances not only existed to justify the initial warrantless entry into the residence but that the exigency continued until the active lab was deactivated and no other active labs were found.[6]

Finally, we must determine whether evidence other than the active lab was properly seized. The State argues that the plain view doctrine operates to justify the seizure of the evidence in this case. This court has stated that the plain view exception applies when: (1) the objects seized were in plain view; (2) the viewer had a right to be in position to view the seized object; and (3) the incriminating nature of the object was immediately apparent. *Cothran*, 115 S.W.3d at 524-25 (Tenn. Crim. App. 2003) (citing *State v. Hawkins*, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997)). In this case, the pictures of appellant's residence show that the majority of the seized evidence was in plain view. The exception is that the inactive labs were concealed in a freezer; however, the necessity of finding any and all active labs, especially when appellant mentioned a freezer in particular, means that the exigent circumstances encompassed the search of the deep freezer. We have already concluded that the investigators were rightfully in position to view all of the objects seized. Based on the investigators' experience with methamphetamine manufacturing, the incriminating nature of the evidence seized was

---

[6] In appellant's reply brief and at oral argument, he argued that appellant's statement to investigators that the laboratory was in the freezer did not create additional exigent circumstances. However, our ruling that the exigency continued from the time that investigators smelled methamphetamine until the active lab was disabled encompasses both Investigator Chunn's initial entry, when he did not find an active lab, and his second entry, when he found an active lab based on appellant's statement; thus, appellant's argument regarding his statement is inapposite. Moreover, any argument that appellant's statement was not voluntary or was taken in contravention of his constitutional rights is waived for failure to address it in the trial court. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

apparent to them. Therefore, we conclude that none of the evidence seized in this case was subject to suppression. Appellant is therefore without relief as to this issue.

## B. Sufficiency of the Evidence

For his second issue, appellant contends that the evidence was insufficient to prove that he possessed firearms with the intent to go armed during the commission of a dangerous felony. He does not contest his other convictions. The State responds that the jury had ample evidence from which it could have determined that appellant was guilty of the two firearm offenses.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

In this state, "[i]t is an offense to possess a firearm with the intent to go armed during the commission of . . . a dangerous felony." Tenn. Code Ann. § 39-17-1324(a). Initiating the process to manufacture methamphetamine is listed in section 39-17-1324(i)(1)(K) as a dangerous felony. As appellant stands convicted of initiation of the process to manufacture methamphetamine, that element of the offense has clearly been met. Appellant claims, however, that the State failed to prove that he intended to go armed. This court has previously ruled that "[t]he fact that the firearm was holstered, loaded, and within the immediate proximity of the contraband established the defendant's intent to go armed and demonstrated a nexus between the firearm and the drugs." *State v. Ronnie Paul Trusty*, No. W2012-02445-CCA-R3CD, 2013 WL 3488150, at *4 (Tenn. Crim. App. July 11, 2013) (citing *State v. Yarbro*, 618 S.W.2d 521, 524-25 (Tenn. Crim. App. 1981)), *no perm. app. filed*; *State v. Victor Armando Martinez*, No. M2010-01820-CCA-R3-CD, 2012 WL 5992148, at *9 (Tenn. Crim. App. Dec. 3, 2012)). In this case, appellant had loaded firearms within reach and/or actually in his hands as the methamphetamine lab was processing in the same small mobile home. From this information, the jury was within its prerogative to find appellant guilty of two counts of possessing a firearm with the intent to go armed during the commission of a dangerous felony. Therefore, we affirm appellant's convictions for this offense.

## CONCLUSION

Following our careful review of the record, the arguments of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE